**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank PETULLO and Anthony Argentiere, Defendants-Appellants.**

**Nos. 82–1664, 82–1665.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 14, 1983.

Decided June 10, 1983.

Robert S. Bailey and Allan A. Ackerman, Chicago, Ill., for defendants-appellants.

Sheila A. Markin, Asst. U.S. Atty., Dan K. Webb-U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and VAN PELT, Senior District Judge.*

CUDAHY, Circuit Judge.

Appellants Frank Petullo and Anthony Argentiere challenge in this appeal their convictions for conspiracy and making false statements in violation of 18 U.S.C. §§ 371 and 1001. Petullo and Argentiere, while working for the City of Chicago during the winter of 1979, were involved in a scheme to obtain money by submitting false claims for snow removal work. The snows of early 1979 were of legendary depth and frequency. Petullo and Argentiere were charged with a federal crime because federal disaster relief funds were used to help pay for snow removal in Chicago. Petullo's principal argument is that the government failed to prove all of the elements necessary to establish a violation of the false statements statute, 18 U.S.C. § 1001. Argentiere's main contention is his own lack of participation in the scheme. We affirm.

* Honorable Robert Van Pelt, Senior District Judge for the District of Nebraska, is sitting by designation.

## I.

■ The federal false statement statute, 18 U.S.C. § 1001,[1] imposes criminal penalties on one who (1) makes a statement that (2) was false, (3) was material, (4) was made knowingly and willfully,[2] and (5) was made in a matter "within the jurisdiction of any department or agency of the United States." *United States v. Beck,* 615 F.2d 441, 452 (7th Cir.1980); *United States v. Fitzgibbon,* 619 F.2d 874, 879 (10th Cir. 1980); *United States v. Smith,* 523 F.2d 771, 779 n. 15 (5th Cir.1975), *cert. denied,* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). *See generally White Collar Crime: False Statements,* 18 Am.Crim.L.Rev. 273 (1980).

Appellants focus on the last of these elements: whether the government proved beyond a reasonable doubt that the false vouchers for snow removal involved a matter within the jurisdiction of a department or agency of the United States. The issue arises because the vouchers were submitted not to a federal agency but to the City of Chicago, which was using commingled federal, state and local funds to pay for snow removal work. Also, because the fraud was discovered fairly rapidly by the city, the false information contained in the vouchers apparently was not passed on to a federal government agency. Finally, appellants contend that the jurisdictional element was not proved because the government did not establish that federal funds had been received by the city at the time the false invoices were submitted.

■ A false statement may fall within section 1001 even when it is not submitted to a federal agency directly and the federal agency's role is limited to financial support of a program it does not itself directly administer. *See United States v. Stanford,* 589 F.2d 285, 297 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). In such cases, "the necessary link between deception of the non-federal agency and effect on the federal agency is provided by the federal agency's retention of 'the ultimate authority to see that the federal funds are properly spent.'" *United States v. Baker,* 626 F.2d 512, 514 n. 5 (5th Cir.1980). Moreover, since it is the *existence* of federal supervisory authority that is important, not necessarily its *exercise,* it does not matter that the early discovery of the fraud by the city kept the false information from actually reaching the federal government. *See United States v. Diaz,* 690 F.2d 1352, 1357 (11th Cir.1982).[3]

An apparently novel question in this case is how one determines, for the purpose of establishing section 1001 jurisdiction, the precise time of commencement of federal involvement in emergency relief services. Unlike the usual section 1001 case, the federal role here was ad hoc, short term, and very quickly implemented.[4] Two seemingly logical operative events are the authorization of federal assistance, *see* 42 U.S.C. §§ 5142, 5145, and the receipt of federal funds by the state or local administering

1. 18 U.S.C. § 1001:

     Whoever, in any manner within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. *Cf. United States v. Hughes,* 585 F.2d 284, 287–88 (7th Cir.1978) (discussing *mens rea* element of civil false claims statute, 31 U.S.C. § 231); *Alsco-Harvard Fraud Litigation,* 523 F.Supp. 790, 806 (D.D.C.1981) (same); *United*

*States v. Milton,* 602 F.2d 231, 232–34 (9th Cir.1979) (discussing *mens rea* element of criminal false claims statute, 18 U.S.C. § 287); *United States v. Maher,* 582 F.2d 842, 847–48 (4th Cir.1978) (same), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1115, 59 L.Ed.2d 73 (1979).

3. *Cf. United States v. DiFonzo,* 603 F.2d 1260, 1266 (7th Cir.1979) (to prove materiality, government need show only that the false statement was capable of influencing an agency, not that the agency actually relied upon the statement), *cert. denied,* 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980).

4. We are not suggesting that we think the federal role here was "peripheral." *See Stanford,* 589 F.2d at 297. Approximately thirty-nine million dollars in federal funds were involved.

agency. Appellants assume that the actual receipt of funds is the critical event and argue that the evidence does not establish clearly that any federal funds were received until after they submitted their vouchers.

█ We think it follows from the purpose of section 1001 that at least in the emergency relief context it should be the *authorization* of federal assistance that triggers federal jurisdiction under the false statements statute. As explained by this court in *Stanford,* 589 F.2d at 297, "[t]he term 'jurisdiction' merely incorporates Congress' intent that the statute apply whenever false statements would result in the perversion of the authorized functions of a federal department or agency." In the instant case, on January 16, 1979, President Carter authorized the Federal Disaster Assistance Administration (the "FDAA") to reimburse the City of Chicago for two-thirds of certain costs of snow removal work performed between January 16, 1979 and January 21, 1979. Tr. at 249. On January 20, 1979, the FDAA authorization was extended to January 25, 1979. Tr. at 250, 261. In addition to the FDAA funds, in January 1979 the United States Department of Housing and Urban Development ("HUD") authorized the city to use Community Development Block Grant funds for snow removal expenses. Tr. at 158, 180. In effect, the city received a line of credit from the federal government which it knew would enable it to pay later for services that were needed immediately. Accordingly, federal funds were effectively (and, for all practical purposes, irrevocably) committed and "spent" once the authorization came through. Therefore, we think that at least in this context section 1001 jurisdiction may commence as early as the officially effective commitment of federal assistance. But we note that in the case before us the jury could have found that the federal funds had actually been received at the time of the offenses. An employee of the Federal Emergency Management Agency testified that $5,000,000 was disbursed to Chicago on February 2, 1979. Tr. at 254.

## II.

Appellants also contend that the district court erred in giving a jury instruction on the *mens rea* element of the crime that included a statement regarding intentional avoidance of knowledge. The court instructed the jury that,

When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident: knowledge may be proven by defendant's conduct, and by all the facts and circumstances surrounding the case. *No person can intentionally avoid knowledge by closing his eyes to facts which should prompt him to investigate.*

Tr. at 603 (emphasis supplied). The district court included the last sentence of the instruction because it was Argentiere's theory of defense that his actions were undertaken without knowledge of what his friend Petullo was up to. *See* Tr. at 608 (jury instruction); Tr. at 436–37 (testimony of Argentiere).

█ This court recently reconsidered the propriety of this very instruction. In *United States v. Burns,* 683 F.2d 1056 (7th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 821, 74 L.Ed.2d 1018 (1983), we approved the intentional avoidance instruction, rejecting arguments that the instruction constitutes a conclusive or rebuttable presumption of intent and that the instruction allows a jury to find criminal culpability on the basis of negligence. We follow *Burns* here.

## III.

█ Appellant Petullo argues that he is entitled to a new trial because his codefendant Argentiere offered what Petullo characterizes as a mutually antagonistic defense. But " 'mutual antagonism' only exists where the acceptance of one party's defense will preclude the acquittal of the other." *United States v. Ziperstein,* 601 F.2d 281, 285 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667

(1980). For example, in *DeLuna v. United States,* 308 F.2d 140 (5th Cir.1962), a package containing narcotics logically had to belong to one of the two defendants. Thus, accepting defendant Gomez's defense that the narcotics belonged not to him but to DeLuna would preclude the jury from also accepting DeLuna's defense that the sole culprit was Gomez. *Id.* at 142.[5] In the instant case, however, Argentiere's defense was that he did not participate in the scheme while Petullo's main defense was that the government could not prove a federal offense. These are not mutually antagonistic defenses since both could have been accepted by the jury.[6]

Appellant Petullo also argues that he is entitled to a new trial because he was prejudiced by Argentiere's counsel's closing argument. Argentiere's counsel stated:

> Now Anthony Argentiere took the witness stand in this case. *You all, of course, are aware or at least you will be when the judge instructs you on the law that no defendant has to produce any evidence and no defendant is under any obligation to take the stand.* Anthony Argentiere could have sat on the chair where he sits now and never told you anything, but he didn't, he got up, he took the stand because we felt the time had come that the truth should be known the way he remembers and the way he lived it as a human being.

Tr. at 563 (emphasis supplied). The complaint is that this statement about Argentiere constituted improper comment upon Petullo's failure to testify at trial. But a statement by counsel asking the jury only to draw *favorable* inferences from *his client's* willingness to testify need not be *per se* prejudicial to a codefendant who did not testify. *See, e.g., United States v. Hines,* 455 F.2d 1317, 1334–35 (D.C.Cir.),

cert. denied, 406 U.S. 975, 92 S.Ct. 2427, 32 L.Ed.2d 675 (1972); *United States v. Blue,* 440 F.2d 300, 302–03 (7th Cir.1971), *cert. denied,* 404 U.S. 836, 92 S.Ct. 123, 30 L.Ed.2d 68 (1971); *United States v. Hutul,* 416 F.2d 607, 621–22 (7th Cir.1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970); *but see Hines,* 455 F.2d at 1335–36 (Bazelon, C.J., dissenting). Caution is certainly indicated in these circumstances, but, where, as here, the remarks of testifying defendant's counsel were limited and counsel concurrently stressed that no defendant need testify or produce any evidence, the codefendant was not unfairly prejudiced.[7] By contrast, in *DeLuna v. United States,* 308 F.2d 140, 143 (5th Cir. 1962), one defendant's counsel, in an attempt to get the jury to believe his client's defense and therefore not to believe the other defendant's mutually antagonistic defense, stated:

> Well, at least [my client] was honest enough and had courage enough to take the stand and subject himself to cross examination and tell you the whole story
> . . . .
> You haven't heard a word from [the other defendant].

*See generally* 8 J. Moore, Moore's Federal Practice ¶ 14.04[3] (2d ed. 1981).

Accordingly, appellants' convictions are

Affirmed.

---

5. *Compare id. with United States v. Talavera,* 668 F.2d 625, 630 (1st Cir.), *cert. denied,* 456 U.S. 978, 102 S.Ct. 2245, 72 L.Ed.2d 853 (1982) *and United States v. Sheikh,* 654 F.2d 1057, 1065 (5th Cir.1981), *cert. denied,* 455 U.S. 991, 102 S.Ct. 1617, 71 L.Ed.2d 852 (1982). *See generally* 1 C. Wright, Federal Practice And Procedure: Criminal §§ 223–226 (2d ed. 1982).

6. Similarly, the jury could have accepted both Argentiere's defense and Petullo's briefly argued alternative defense that the evidence did not establish his involvement in the scheme.

7. In addition, Petullo and Argentiere were not pursuing mutually antagonistic defenses.