UNITED STATES of America,
Plaintiff-Appellee,

v.

Phanuel J. HAMILTON,
Defendant-Appellant.

No. 83–2052.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 28, 1983.

Decided Jan. 13, 1984.

Rehearing Denied Feb. 7, 1984.

Anna R. Lavin, Chicago, Ill., for defendant-appellant.

William J. Cook, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and GRANT, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendant-appellant Phanuel J. Hamilton and Rita M. Degonia were charged in August 1982 with converting to their own use over $4000 of federal funds appropriated under the Comprehensive Employment and Training Act (CETA). Count I charged a conspiracy among Degonia, Hamilton, and others, and five subsequent counts charged Degonia[1] with substantive violations of 18 U.S.C. § 665(a) for converting CETA funds to her own use and Hamilton with aiding and abetting Degonia to violate § 665(a). Hamilton was found guilty of conspiracy and all but one of the other five counts.[2]

Hamilton raises four issues on appeal. He questions the sufficiency of the evidence against him. He also claims that his knowledge of a federal interest in the converted funds is a necessary element of the offense but was not proved. Hamilton further questions whether there was in fact any substantial federal interest in the particular funds. Lastly, he claims that the indictment improperly joined offenses and persons in violation of Rule 8, Fed.R.Crim.P. We affirm.

### I.

The facts, largely undisputed, reveal a simple scheme to aid Degonia's admitted embezzlement of CETA funds. Between June and September 1980, Degonia was director of an adult training program of the Chicago Metropolitan YMCA, known as the Cottage Industries Training Program (CITP). Under the program, about sixty-four persons received job training at four suburban YMCA locations. The trainees' wages were covered by a reimbursement agreement with the United States Department of Labor; the federal government disbursed CETA funds to the Cook County Office of Manpower which in turn reimbursed its subgrantee, the YMCA, for the CITP payroll expenses. Degonia's responsibilities at CITP included supervision of trainee time sheets and payroll authorizations, which required her to receive the payroll checks and distribute them to the trainees.

For each of several pay periods, Degonia took some of the names of fifteen trainees no longer active in CITP and added them to the payroll. This caused a total of thirty-six unearned wage checks to be prepared and sent to her along with the properly earned checks. She withdrew only the unearned checks from distribution to the trainees and kept them for her own purposes. Degonia enlisted her friend, Hamilton, to help her convert twenty-seven of the fraudulent checks to cash. Hamilton at the time was Director of Individual Services in the Chicago Mayor's Office for Senior Citizens. Degonia delivered the checks to Hamilton at street locations between their two Chicago offices. Hamilton cashed the third-party wage checks drawn on the YMCA payroll account at several locations. On occasion, he claims he cashed the checks using personal cash he had with him. Some of the checks already evidenced fictitious payee endorsements when Hamilton received them. A government handwriting expert testified she was "virtually certain" that other payee endorsements had been added by Hamilton. Most of the check-cashing locations selected by Hamilton did not require his second endorsement. Hamilton returned most of the proceeds from the payroll checks to Degonia, but deposited some of the money in his overdrawn personal bank account.

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. Degonia pled guilty to all but the conspiracy count. In a joint bench trial with Hamilton, she was found guilty of the conspiracy count. Degonia is not involved in this appeal.

2. Hamilton was sentenced to three years' probation and ordered to make restitution to two organizations in the total amount of $424.20 and perform 200 hours of community service.

One detail in the execution of the conspiracy was overlooked: the inactive trainees to whom the fraudulent wage checks were made out received W–2 forms which reflected more wage income than they had received from CITP. The inquiries of these inactive trainees resulted in an internal YMCA investigation which ultimately led to this indictment. In that investigation, Hamilton initially admitted cashing fifteen of the fraudulent checks, but claimed that the payees already had endorsed the checks and that he returned all the proceeds to Degonia. He failed to mention the twelve other checks.

## II.

■ The evidence and the inferences to be drawn therefrom are clearly sufficient to show Hamilton's complicity in the scheme despite his innocent explanation. Hamilton does concede the criminality of Degonia's conduct, but explains that he thought he was only helping the suburban trainees who otherwise might have encountered some inconvenience in cashing their own checks. Among other things, Hamilton's explanation overlooks the handwriting analysis of some of the endorsements and the fact that a portion of the proceeds went into his overdrawn personal account.

In finding guilt beyond a reasonable doubt, the trial judge carefully analyzed all the evidence and noted the fact that Hamilton took possession of and negotiated the fraudulent checks shortly after their issuance. Hamilton seizes upon that one aspect of the finding of guilt to question whether possession of recently issued fraudulent checks properly raises a reasonable inference of guilt under the well-known doctrine of recent possession of stolen goods. The government relies on *United States v. Strickland,* 509 F.2d 273, 276 (5th Cir.1975), and our cases, *United States v. Bailey,* 526 F.2d 139, 141 (7th Cir.1975), *cert. denied,* 424 U.S. 972, 96· S.Ct. 1472, 47 L.Ed.2d 740 (1976) (possession of stolen United States savings bonds), and *Altom v.*

*United States,* 454 F.2d 289, 293–94 (7th Cir.1972), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1765, 32 L.Ed.2d 116 (1973) (possession of stolen government generators), to support application of the doctrine.

We find no error in the trial judge taking into account, along with the other evidence of guilt, the fact that the fraudulent checks all were issued very recently and yet supposedly had already been distributed to the suburban trainees, endorsed by them, and returned to Degonia to give to Hamilton to be cashed. More weight was not given to that factor than it deserved in the context of all the evidence of guilt. The trial judge found that defendant's explanation not only did not aid his defense, but actually was incriminating.

The evidence clearly is sufficient to support Hamilton's conviction for conspiring with Degonia; the two needed each other to execute the scheme from which they both benefited. Further, the evidence is sufficient to satisfy the tests of association and participation to support Hamilton's conviction as an aider and abettor under *United States v. Beck,* 615 F.2d 441, 448–49 (7th Cir.1980).

## III.

■ Related to Hamilton's claim of insufficient evidence is his assertion that his personal knowledge of the funds' federal origin was an element of the crime which the government was required, but failed, to prove. Hamilton denies that he knew the checks involved federal funds.

The trial judge fully addressed this issue, holding that the government did not have to prove that Hamilton actually knew that federal funds were the object of the conspiracy. The trial judge determined that the origin of the funds was jurisdictional only; Hamilton's knowledge and intention to aid and abet Degonia in her criminal acts was sufficient to satisfy the knowledge requirement of § 665.[3] *See United States v.*

---

**3.** Section 665 provides in relevant part:

Whoever, being an ... employee of ... any agency ... receiving financial assistance or

**320**

*Arambasich,* 597 F.2d 609, 613 (7th Cir. 1979).

With little guidance from legislative history or case law concerning any requirement of knowledge of the federal origin of funds taken in violation of §665, defendant urges us to pattern our analysis upon an analogy to §656, which relates to embezzlement by an employee of a national or insured bank with intent to defraud the bank. But we need not wander that far afield, since a closer analogy is found in the general section concerning embezzlement of public money, 18 U.S.C. §641. In *United States v. Coleman,* 590 F.2d 228 (7th Cir. 1978), *cert. denied,* 440 U.S. 980, 99 S.Ct. 1786, 60 L.Ed.2d 239 (1979), a §665 prosecution, we turned to cases under §641 as the closest analogy in defining "property" under §665. *Id.* at 231. We have not required knowledge of federal involvement under §641. *See United States v. Smith,* 489 F.2d 1330, 1334 (7th Cir.1973), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2407, 40 L.Ed.2d 773 (1974) (taking federal funds from undercover narcotics agent). We also have found that no knowledge of federal involvement is necessary in a §1001 prosecution for knowing falsification in any matter within the jurisdiction of a federal department or agency. *See United States v. Stanford,* 589 F.2d 285, 297–98 (7th Cir. 1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979) (making fraudulent application for federal public aid benefits). We believe that Congress, through §665, desired to afford federal protection to the large sums of federal money entrusted to nonfederal agencies to accomplish the purposes of CETA, and did not intend to limit this protection to situations where the defendant was aware of a federal interest in the funds. *Cf. id.*

### IV.

■ But even if his personal knowledge of federal funding is not an element of the offense. Hamilton argues that the §665 prosecution must fail because no substantial federal interest was shown in the particular funds upon which the fraudulent checks were drawn. Hamilton claims that although the YMCA made reimbursement claims to the Cook County Office of Manpower for its CITP payroll, there was no showing that Cook County actually reimbursed the YMCA; consequently the embezzled funds cannot be traced back to the federal government. If there were any CETA funds involved, Hamilton argues, they were commingled with and diluted by other funds and thus lost their federal character.

We view the government's evidence as having sufficiently established the federal nexus between the fraudulent checks and federal funds. All CITP payroll checks written by the YMCA were completely reimbursed by Cook County with CETA funds received from the United States Treasury in accordance with contractual arrangements. The Cook County Office of Manpower deposited federal CETA funds upon receipt in a special account for timely reimbursement to the YMCA and other program participants. Reimbursement receipts and checks showing reimbursements by the United States Treasury for the period in question were introduced along with YMCA invoices for the checks.

■ Hamilton argues that the indictment describes the federal funding of CITP as "grants," whereas in reality CITP was funded through a reimbursement arrangement providing federal funds only after expenses were incurred and paid by the YMCA. However, the two amount to the same thing. The CITP payroll was paid with CETA funds which had to pass through the bureaucratic pipeline from Washington to the local CITP payroll, but

---

any funds under the Comprehensive Employment and Training Act ... knowingly enrolls an ineligible participant, embezzles, willfully misapplies, steals, or obtains by fraud any of the moneys, funds, assets, or property which are the subject of a financial assistance

agreement or contract pursuant to such Act shall be fined not more than $10,000 or imprisoned for not more than 2 years, or both

. . . .

18 U.S.C. §665(a).

federal money went into the pipeline and remained federal money all the way into defendant's personal bank account. In a prosecution under § 1001, we held that federal agency involvement is sufficient even when limited to the reimbursement of expenditures. *See United States v. Stanford,* 598 F.2d 285, 297 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). The nexus is not lost even when the government fails to show that the federal funds were received by the time the false invoices were submitted. *United States v. Petullo,* 709 F.2d 1178, 1181 (7th Cir.1983). We continue in our view that the nexus between federal funds in the hands of a non-federal agency and the impact on a federal funding program is found in the federal program's continuing responsibility to see that the federal funds are spent as Congress intended. *See Stanford,* 598 F.2d at 297–98. The present prosecution passes that test.

### V.

As a last issue, Hamilton argues that the indictment improperly joined offenses and persons in violation of Fed.R.Crim.P. 8. His motion was denied before trial. The basis of his argument is the claim that Hamilton had no connection with the others who cashed checks for Degonia or with locations where other checks were cashed.

The evidence was sufficient under recognized conspiracy law to show that one conspiracy was formed by Degonia and others to fraudulently convert CETA training funds to her and others' personal use. The evidence further showed that Hamilton negotiated at least one fraudulent check as charged in each of the counts. There was no need for duplicative trials when the charges against both defendants could be proved by the same evidence and the charges resulted from the same scheme or series of acts. *United States v. McPartlin,* 595 F.2d 1321, 1333 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

### VI.

We find no reversible error, and affirm the conviction.