**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert J. BRACK, Defendant-Appellant.**

**No. 83–3208.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 17, 1984.

Decided Oct. 31, 1984.

Certiorari Denied Feb. 19, 1985.

See 105 S.Ct. 1193.

John R. O'Brien, Chicago, Ill., for defendant-appellant.

Ruben Castillo, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

* Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. Title 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according

Before BAUER and POSNER, Circuit Judges, and CAMPBELL, Senior District Judge.*

BAUER, Circuit Judge.

Defendant Robert J. Brack appeals his conviction of two counts of mail fraud, in violation of 18 U.S.C. § 1341,[1] and two counts of making false statements, in violation of 18 U.S.C. § 1001.[2] Defendant appeals on the grounds that the indictment was insufficient or that, even if sufficient, there was a variance between the indictment and the evidence presented by the government at his first trial. Defendant also contends that the evidence presented at his first trial, which resulted in a hung jury and a mistrial, was insufficient, and that therefore his retrial violated his Double Jeopardy and Due Process rights. Finally, defendant argues that the evidence presented at his second trial was insufficient, and that he was denied a fair trial by improper attempts to impeach his testimony and by improper comments during the prosecutor's closing argument.

### Facts of the Case

Defendant owned and operated Joseph Construction Company, a general contractor. In May of 1979, defendant entered into a contract to complete a roofing project at Hines V.A. Hospital. The project was originally contracted out to Cleary Waterproofing Company [hereinafter Cleary], but Cleary had defaulted on the contract after completing approximate-

to the direction thereon, ... any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

2. Title 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device of material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

ly 80% of the work. Cleary's surety, International Fidelity Insurance Company [hereinafter I.F.I.C.], then entered into a contract with defendant to complete the project.

Cleary had obtained a performance bond from I.F.I.C., and this bond was in turn guaranteed by the Small Business Administration as part of a program designed to assist small contractors in obtaining work. Under its bond guaranty program, the SBA guarantees sureties that it will pay 90% of the losses they may suffer as a result of guaranteeing the performance of small contractors who default. Pursuant to this agreement, the SBA was obligated to reimburse I.F.I.C. for 90% of the cost of its contract with Joseph Construction to complete the roofing project at Hines.

I.F.I.C., which is located in New Jersey, had hired Chrismar Management Corporation [hereinafter Chrismar] to investigate the extent of the work already performed by Cleary on the Hines project and the amount of work needed to complete the project. Chrismar is owned and operated by defendant's brother, Thomas Newhall. After its investigation of the Hines project, Chrismar received a bid of $27,500 from Larson Roofing Company to complete the project. Antonio Alvarado, an architect at Chrismar who investigated the Hines project, determined that Larson Roofing's bid to complete the project was reasonable. I.F.I.C., however, was not informed of Larson Roofing's bid.

Shortly after Chrismar had received Larson Roofing's bid, defendant was contacted by Joseph Consentino, an insurance broker with American Bonding Company, the local agent for I.F.I.C. Consentino described himself as a close personal friend of defendant. Consentino requested an estimate from defendant of the cost of completing the Hines project. Defendant, in turn, requested a bid from Rainey-Harris Roofing Company. Rainey-Harris submitted a bid of $152,185, which included the complete removal of all the roofing material, including work already done by Cleary. At this time, defendant was also informed

of Larson Roofing's bid. Defendant then discussed both bids with Consentino, and entered into an agreement with Consentino whereby Joseph Construction would complete the Hines project for $88,547. Shortly after reaching this agreement, on May 21, 1979, defendant subcontracted Larson Roofing to complete the Hines project for $30,000.

On May 30, 1979 defendant submitted a sworn statement regarding the costs of the Hines project, along with an architect's affidavit, to I.F.I.C. The statement disclosed that Joseph Construction had entered into a contract with Larson Roofing for $34,500 to do roofing work on the project. In fact, Joseph Construction had hired Larson Roofing to complete the Hines project for $30,000. Further, the statement indicated that Joseph Construction has entered into a contract with Stanton Bay Construction to do "Slate Repair" for $31,381. In fact, Joseph Construction had no contract whatsoever with Stanton Bay, which was not qualified to do the roofing work needed on the Hines project. The statement also included amounts of $10,400 and $12,266 to Joseph Construction for "Supervision" and "General Conditions," respectively. Finally, the architect's affidavit was signed by Newhall, who is not an architect, before the figures above were entered on it by defendant.

The May 30 statement sought payment of $39,560 from I.F.I.C. for "work already completed." The statement indicated that the payment requested would be divided as follows: $11,500 to Larson Roofing, $20,460 to Stanton Bay, and $7,600 to Joseph Construction. Upon receipt of the statement, I.F.I.C. issued a check for $39,560 to Joseph Construction. It was not until July 20, however, that Larson Roofing sent its first request for payment to Joseph Construction in the amount of $10,000, and, as just stated, no money was due to Stanton Bay for work on the Hines project.

On July 30, 1979, I.F.I.C. received a similar statement from Joseph Construction, requesting payment in the amount of $29,954. This statement incorporated the fig-

ures listed in the May 30 statement and indicated that payments had been made to Larson Roofing and Stanton Bay in the amounts listed in that statement. In fact, no payments to either company had been made. The July 30 statement also indicated that portions of the payment requested would be sent to Larson Roofing and Stanton Bay. Newhall again signed a blank architect's affidavit for the July 30 statement.

Apparently due to a dispute involving payment for other jobs which Joseph Construction had been hired by I.F.I.C. to complete, no payment was made to Joseph Construction based on the second request. Rather, in October of 1979, I.F.I.C. made a direct payment of $30,000 to Larson Roofing, which had received no money from Joseph Construction, for the completion of the Hines project. In fact, Larson Roofing was the only contractor to work on the Hines project, which it successfully completed for $30,000.

On February 7, 1983, defendant was indicted and charged with two counts of mail fraud and two counts of making false statements. The indictment alleged that defendant devised a scheme to defraud the government by obtaining a fraudulently inflated contract with I.F.I.C. and by submitting false statements to I.F.I.C. to conceal the fraudulent nature of the contract. Defendant's first trial ended in a hung jury and a mistrial. At that trial, defendant moved for a directed verdict and, after the mistrial was declared, for judgment of acquittal based on the insufficiency of the evidence. Neither motion was granted, and a second trial was ordered, at which defendant was convicted of all four charges against him.

### I. Sufficiency of the Indictment

■ Defendant first contends that the indictment was insufficient to allege violations of both the mail fraud counts[3] and the false statement counts.[4] An indictment is sufficient if it contains the elements of the offense charged and adequately informs the defendant of the specific charges against him, enabling him to prepare a defense for trial and permitting him to plead an acquittal or conviction in order to bar any future prosecution for the same offense. *Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974); *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932). The indictment in this case meets this standard and the District Court properly denied defendant's motion to dismiss the indictment at trial.

■ Defendant asserts that the indictment was insufficient for several reasons, all of which relate to the same basic argument. Briefly, this argument states that the contract between defendant, doing business as Joseph Construction, and American Bonding, as agent by I.F.I.C., was an arm's length agreement. Once the contract was formed, defendant claims that he was entitled to the contract amount if he adequately performed the work required by the contract. Therefore, defendant argues that payment of the contract amount was in no way dependent upon his subsequent false statements.

Using this argument, defendant contends that the indictment failed to allege a scheme to defraud the government. Similarly, defendant asserts that, because the SBA was already obligated to pay 90% of I.F.I.C.'s losses on the Hines project after Cleary's default, the false statements sub-

---

**3.** The charge of mail fraud, 18 U.S.C. § 1341, which comprises counts I and II of the indictment, consists of two elements; 1) a scheme to defraud and 2) the use of mail in furtherance of that scheme. *See United States v. Keane*, 522 F.2d 534, 544 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976).

**4.** The charge of making a false statement in violation of 18 U.S.C. § 1001, which comprises counts III and IV of the indictment, consists of 1) making a false statement 2) of material fact 3) with fraudulent intent 4) in any matter within the jurisdiction of any federal department or agency. *See United States v. Weatherspoon*, 581 F.2d 595, 601 (7th Cir.1978).

mitted to I.F.I.C. on May 30 and July 30, 1979, did not affect SBA's liability and were not "material" within the meaning of § 1001.

■ The fatal flaw in defendant's basic argument, and hence in his several contentions, is the presumption that the initial contract amount was the result of an arm's length bargain. To the contrary, the indictment alleges that defendant fraudulently calculated the amount of the contract, that he obtained the contract for a fraudulently inflated amount, and that he later sought to conceal the fraud by submitting the false statements of May 30 and July 30, 1979. Therefore, defendant's assertion that the indictment failed to allege a scheme to receive money to which he was not entitled is erroneous. Further, the test for materiality is whether the false statement has a tendency to influence or is capable of influencing a federal agency. *United States v. Difonzo*, 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980). The indictment clearly met this test by alleging that the false statements of May 30 and July 30 were used to conceal the fraudulent nature of the contract, thereby inducing payments to which defendant was not entitled.[5]

Finally, defendant argues that the indictment was insufficient because the mail fraud counts did not allege how the contract amount became fraudulently inflated or, more fundamentally, what constitutes a fraudulently inflated amount. Defendant also asserts that he had no duty to accurately disclose his costs to I.F.I.C., and, therefore, that concealing the true nature of the contract was not fraud.

■ In construing an indictment under the mail fraud statute, a broad rather than a technical standard should be used to determine the sufficiency of the allegation of fraud. *United States v. Stanford*, 589 F.2d 285, 296 (7th Cir.1978), *cert. denied*, 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979); *United States v. Keane*, 522 F.2d 534, 544 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). Moreover, we must examine the indictment as a whole to determine whether it adequately informed the defendant of the charges against him. *United States v. Debrow*, 346 U.S. 374, 376, 74 S.Ct. 113, 114, 98 L.Ed. 92 (1953); *United States v. Stanford*, 589 F.2d at 296.

Using these guidelines, the indictment was clearly sufficient. In addition to reciting the elements of the mail fraud charge, the indictment specifically alleged that the contract amount was calculated dishonestly in that defendant knew that the Hines project could be completed for $27,500, but contracted to complete the project for $88,547. The indictment further enumerated the subsequent false statements by which defendant sought to conceal the inflated nature of the contract amount. These allegations described conduct which did not meet the standard of "fundamental honesty, fair play, and right dealing" which is used to determine fraud. *United States v. Stanford*, 589 F.2d at 596; *United States v. Keane*, 522 F.2d at 545 (*quoting Blachly v. United States*, 380 F.2d 665, 671 (5th Cir.1967)). Furthermore, in *Stanford*, this Court specifically rejected the argument that an indictment fails to allege fraud under § 1341 simply because the defendant owes no fiduciary duty to the victims of the fraud. *Stanford, supra* at 296. Therefore, the indictment fully informed defendant of the charges of fraud alleged in Counts I and II and was legally sufficient.

## II. The Sufficiency of the Evidence

Defendant challenges the denial at the first trial of his motion for directed verdict and, after the mistrial was declared, his motion for judgment of acquittal. Defendant based these motions on the insufficien-

---

5. Defendant's basic argument, which is repeated throughout his Brief, is based on civil contractual law. Although inapplicable in a criminal case, a "basic contract principle" not referred to in defendant's argument is that a contract ob-tained by fraud is void *ab initio*. The false statements of May 30 and July 30 were used to induce performance of the contract by concealing the fraud, and were therefore material even under defendant's misplaced contract argument.

cy of the government's evidence. He argued in his Brief that if the evidence presented at the first trial was insufficient to support a verdict of guilty, the Double Jeopardy Clause of the Constitution barred his retrial. Defendant therefore seeks review of the sufficiency of that evidence. After defendant filed his Brief, however, the United States Supreme Court decided *Richardson v. United States,* — U.S. ——, 104 S.Ct. 3081, 82 L.Ed.2d 242 (1984), which, defendant agrees, eliminates defendant's double jeopardy argument.[6]

It is well established that retrial following a mistrial due to a hung jury does not violate the Double Jeopardy Clause. *Richardson,* — U.S. ——, 104 S.Ct. 3081, 3085, 82 L.Ed.2d 242 (1984); *Arizona v. Washington,* 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978); *Logan v. United States,* 144 U.S. 263, 297–98, 12 S.Ct. 617, 627–28, 36 L.Ed. 429 (1892). Similarly, the Double Jeopardy Clause applies only after the occurrence of an event, such as acquittal or conviction, which terminates the original jeopardy. *Richardson,* — U.S. at ——, 104 S.Ct. at 3086; *Justices of Boston Municipal Court v. Lydon,* 466 U.S. ——, ——, 104 S.Ct. 1805, 1813, 80 L.Ed.2d 311 (1984); *Price v. Georgia,* 398 U.S. 323, 326–27, 90 S.Ct. 1757, 1759–60, 26 L.Ed.2d 300 (1970). Here, the declaration of a mistrial at the first trial did not terminate defendant's original jeopardy, and therefore his retrial did not violate the Double Jeopardy Clause. *See Price v. Georgia,* 398 U.S. at 326–27, 90 S.Ct. at 1759–60; *Green v. United States,* 355 U.S. 184, 189, 78 S.Ct. 221, 224, 2 L.Ed.2d 199 (1957); *United States v. Ball,* 163 U.S. 662, 669, 16 S.Ct. 1192, 1194, 41 L.Ed. 30 (1896). Moreover, *Richardson* holds that regardless of the sufficiency of

the evidence presented at the first trial, the defendant has no valid double jeopardy claim to prevent his retrial. *Richardson,* 104 S.Ct. at 3086. Therefore, the sufficiency of the evidence at defendant's first trial is not reviewable under double jeopardy principles.

In his Supplemental Brief, defendant admits that he has no valid double jeopardy claim, but argues that appellate review of the sufficiency of the evidence at the first trial is necessary to protect his Due Process rights. The Due Process Clause provides that a criminal defendant may be convicted only upon proof beyond a reasonable doubt of every element of the crime with which he is charged. *Jackson v. Virginia,* 443 U.S. 307, 315, 99 S.Ct. 2781, 2786, 61 L.Ed.2d 560 (1979); *In re Winship,* 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970). Thus, the protection of the Due Process Clause focuses on conviction, not retrial. Defendant was not convicted at his first trial, and therefore has no right to appellate review of the evidence presented at that trial under the Due Process Clause.[7]

Defendant also challenges the sufficiency of the government's evidence at the second trial, which resulted in his conviction. Upon review, we must sustain the verdict if there is "substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *Burks v. United States,* 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Using this standard, we conclude that the evidence presented at the second trial was

---

**6.** In *Richardson,* the Supreme Court addressed the issue of whether a criminal defendant whose first trial resulted in a hung jury and a mistrial has a right to appellate review of the sufficiency of the evidence before retrial.

**7.** In his Brief, defendant argued extensively that there was a variance between the indictment and the evidence presented at the first trial, thereby depriving him of his Fifth Amendment right not to be placed in jeopardy for offenses

or facts not found by the grand jury. *See Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962). This issue is also not reviewable for the reasons just discussed. Defendant does not contend in either his Brief or his Supplemental Brief, which was filed after *Richardson,* that the evidence presented at the second trial varied from the allegations of the indictment.

sufficient to convict defendant of all four charges against him.

Defendant first contends that the government failed to prove the evidence of a scheme to defraud, as required by § 1341 for a conviction of mail fraud. The government's evidence, however, showed that defendant had close ties to both parties responsible for ensuring the fairness of the contract with I.F.I.C. Newhall, defendant's brother, had also been in business with defendant. The two of them had formed Chrismar, which was responsible for investigating Cleary's default on the Hines project and reporting its findings to I.F.I.C. Despite this responsibility, Newhall never reported Larson Roofing's bid to I.F.I.C., even though Chrismar's architect, Alvarado, had described the bid as reasonable.

Consentino, a close personal friend of defendant, was empowered to enter into the Hines completion contract on behalf of I.F.I.C. With the knowledge that Larson Roofing could complete the Hines project for $27,500, defendant and Consentino agreed to give Joseph Construction the contract for $88,547. Defendant then promptly subcontracted with Larson Roofing, which, as expected, completed the project for $30,000, giving defendant a profit of $58,547 on the Hines contract even though he did none of the work.

This evidence indicates that defendant, with the complicity of Newhall and Consentino, obtained a contract greatly in excess of its reasonable value, acted only to contract with a firm to do the work which I.F.I.C. could have contracted with directly, and then concealed the fact that the work was done solely by Larson Roofing through the statements of May 30 and July 30. It is therefore clear that the government presented substantial evidence to support the jury's finding of a scheme to defraud.

Second, defendant contends that he lacked the intent to defraud the government required by § 1341 because he disclosed Larson Roofing's bid to Consentino prior to contracting for the Hines project. This contention ignores the fact that the evidence, viewed most favorably for the government, indicates that Consentino complied with defendant's scheme to defraud the government, or at least relied on misrepresentations by defendant that Larson Roofing's bid was not reasonable.[8] Therefore, the jury had substantial evidence to find defendant's intent to defraud despite the disclosure of Larson Roofing's bid to Consentino.

Defendant also contends that he did not "knowingly and willfully" make the false statements of May 30 and July 30, as required by § 1001. In support of this contention, defendant argues that the printed terms on the statements were ambiguous, and that the entries beneath those terms were not false. Specifically, defendant asserts that the term "net previously paid" did not mean that the amounts listed below that term had actually been paid, but that those amounts were "to become due" or, as in the case of Stanton Bay, were "anticipated to become due." We find that the government presented sufficient evidence for the jury to reject defendant's contention.

In addition to the evidence of the scheme to defraud detailed above, the testimony of Newhall and Alvarado stated that it was improper to list a contract with Stanton Bay when no contract existed, or to indicate that particular amounts had been paid when no such payments were made. Further, the contract with Larson Roofing was listed as $34,500 when it was actually $30,000. Even using defendant's strained definition, this amount was not to become due to Larson Roofing. Therefore, the evidence was sufficient to prove that the false statements were made with the requisite intent.

8. In his Brief, defendant states that he expressed his "concern" to Consentino regarding Larson Roofing's ability to complete the project for $27,500. The evidence indicates, however, that defendant knew the bid to be reasonable, and any representations to Consentino to the contrary can be viewed as part of defendant's scheme to defraud I.F.I.C.

Finally, defendant contends that the evidence failed to show that the false statements of May 30 and July 30 were material, as required by § 1001. The test for materiality under this section is whether the statement had a natural tendency to influence, or was capable of influencing, the decision of a government agency in making a determination required to be made. The agency need not actually rely on the statement. *United States v. Petullo*, 709 F.2d 1178, 1180 (7th Cir.1983); *United States v. Difonzo*, 603 F.2d 1260, 1266 (7th Cir.1979), *cert. denied*, 444 U.S. 1018, 100 S.Ct. 672, 62 L.Ed.2d 648 (1980).[9] Defendant applies the ubiquitous argument that the SBA was obligated to pay 90% of the contract between I.F.I.C. and Joseph Construction at the time of the agreement because, according to the terms of the bond guarantee program, the SBA had no discretion in determining whether to reimburse I.F.I.C. for the contract amount. Therefore, defendant asserts that the evidence did not prove that the false statements were capable of influencing the SBA's decision to reimburse I.F.I.C. and were not material.

 We disagree with defendant's contentions that the SBA was required to reimburse I.F.I.C. for payment of a fraudulently inflated contract, and that the false statements of May 30 and July 30 were not capable of influencing the determination of the SBA to reimburse I.F.I.C. False statements made to conceal a fraud are no less material for the purposes of § 1001 than false statements designed to induce fraud. *See United States v. Vorhees*, 593 F.2d 346, 350 (8th Cir.), *cert. denied*, 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 665 (1979) (*citing United States v. Jones*, 464 F.2d 1118, 1122 (8th Cir.1972), *cert. denied*, 409

U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692 (1973)). Similarly, although the statements of May 30 and July 30 accurately reflected the amount of the contract between I.F.I.C. and defendant, the evidence showed that the contract amount was not the result of honest calculation, but was inflated by fraud. Therefore, even though the statements were accurate as to the total amount of the contract they constituted false statements within the meaning of § 1001 by concealing the fraudulent nature of the contract. *See United States v. Huber*, 603 F.2d 387, 398 (2d Cir.1979), *cert. denied*, 445 U.S. 926, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

These statements were sent by I.F.I.C. to the SBA for reimbursement. They were, therefore, capable of influencing the SBA in determining the amount of reimbursement to which I.F.I.C. was entitled. Furthermore, the statements were capable of influencing the SBA in that these statements were part of I.F.I.C.'s records relating to the bond guarantee program, and the SBA reserves the right to audit the records of any surety participating in the program,[10] to vary the terms of guarantees after evaluation of a surety's practices and management of its losses,[11] and to investigate for possible violations of the statute.[12] Therefore, we find that the evidence presented at trial was sufficient to meet the materiality requirement of § 1001.

### III. Agency Jurisdiction

Defendant contends that the statements of May 30 and July 30 were not submitted in a matter within the jurisdiction of a federal agency, and are therefore outside the scope of § 1001. In support of this contention, defendant asserts that he did not know of the SBA's guaranty of I.F.I.

---

**9.** Five other circuits which have addressed the issue of materiality are in agreement. *See United States v. Diaz*, 690 F.2d 1352, 1357 (11th Cir.1982); *United States v. Markham*, 537 F.2d 187, 196 (5th Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 739, 50 L.Ed.2d 752 (1977); *United States v. Cole*, 469 F.2d 640, 641 (9th Cir. 1972); *United States v. Jones*, 464 F.2d 1118, 1122 (8th Cir.1972), *cert. denied*, 409 U.S. 1111, 93 S.Ct. 920, 34 L.Ed.2d 692 (1973); *Gonzales v.*

*United States*, 286 F.2d 118, 122 (10th Cir.1960), *cert. denied*, 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190 (1961).

**10.** 15 U.S.C. § 694b(g) (1978); 13 C.F.R. § 115.-14(a) (1981).

**11.** 13 C.F.R. § 115.6(b) (1981).

**12.** 13 C.F.R. § 115.14(b) (1981).

C.'s performance bond, and that this lack of knowledge is the decisive factor in determining whether the statements were within the SBA's jurisdiction because of its "peripheral" involvement in the bond guaranty program. We do not believe that this correctly states the law.

Generally, jurisdiction for the purposes of § 1001 is to be given a broad rather than a narrow meaning. *See United States v. Rodgers,* —— U.S. ——, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984); *Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969). The false statement need not be submitted directly to the federal agency: it suffices to show that the deception of a private company affected a federal agency because of that agency's responsibility to ensure that its funds are properly spent. *United States v. Hamilton,* 726 F.2d 317, 321 (7th Cir.1984); *United States v. Petullo,* 709 F.2d 1178, 1180 (7th Cir.1983); *United States v. Stanford,* 589 F.2d 285, 297–98 (7th Cir.1978), *cert. denied,* 440 U.S. 983, 99 S.Ct. 1794, 60 L.Ed.2d 244 (1979). Moreover, "[I]t is the *existence* of federal supervisory authority that is important, not necessarily its *exercise.*" *Petullo,* 709 F.2d at 1180 (emphasis original). Thus, statements may be within the purview of § 1001 even though the federal agency does not directly administer its program, but is limited to reimbursing private companies which participate in the program. *Hamilton,* 726 F.2d at 321; *Petullo,* 709 F.2d at 1180; *Stanford,* 589 F.2d at 297.

Using these principles, it is clear that defendant's statements of May 30 and July 30 were made in a matter within the jurisdiction of the SBA. The SBA was responsible for reimbursing I.F.I.C. for the completion cost of the Hines project, and the amount of reimbursement was affected by defendant's defrauding of I.F.I.C. Further, the SBA retained authority to supervise the bond guaranty program pursuant to the statute authorizing the program and the Code of Federal Regulations.[13] Therefore the SBA did not "wash its hands" of responsibility for the bond guaranty program, as defendant asserts, but retained the ultimate authority necessary for agency jurisdiction under § 1001.[14]

We also reject defendant's contention that his lack of knowledge of the SBA's involvement removed the false statements of May 30 and July 30 from the purview of § 1001. The authority defendant cites states only that such lack of knowledge "may be one circumstance to be considered [when the government's involvement] in the matter to which the statement relates is peripheral." *Stanford,* 589 F.2d at 297. Thus, although knowledge may be considered in determining jurisdiction, it is not required. *Stanford, supra* at 297. Rather, the focus of § 1001's jurisdiction requirement is the potential threat of the false statement to the proper functioning of the agency involved. *See United States v. Rodgers,* —— U.S. at ——, 104 S.Ct. at 1947 (citing *United States v. Gilliland,* 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941)); *Stanford,* 589 F.2d at 297–98.

Here, the threat of statements such as those made by defendant to the proper functioning of the SBA's bond guaranty program is great. The SBA processes such a large number of reimbursement claims through the program that it cannot investigate each claim, but must rely on the private sureties participating in the program to ensure the proper expenditure of federal funds. Defendant's false statements clearly had the potential to result in the "perversion" of a federal agency's functions which § 1001 was designed to prohibit, regardless of defendant's knowledge of the SBA's in-

---

**13.** *See* notes 10–12 and accompanying text.

**14.** In his Brief, defendant admits that the amount of the loss on the Hines project is "colorably within the jurisdiction of the SBA," but argues again that the statements of May 30 and July 30 "truthfully" represented the amount of that loss, and were therefore not false state-

ments within the agency's jurisdiction. Again, this argument fails because it ignores the initial fraud in calculating the contract, which greatly increased the amount of the loss on the Hines project, and which the false statements sought to conceal.

volvement. *See United States v. Rodgers,* — U.S. at ——, 104 S.Ct. at 1947; *United States v. Stanford,* 589 F.2d at 297–98.

### IV. The Government's Attempts to Impeach Defendant

Defendant contends that the government's attempts to impeach him at his second trial with inconsistent testimony elicited at the first trial were improper on four occasions and amounted to plain error, requiring reversal and a new trial. Defendant argues that the first three allegedly improper impeachment attempts referred to answers to questions at the first trial which were taken out of context, or were in response to questions completely different from those asked at the second trial. The fourth allegedly improper attempted impeachment was not completed, and defendant argues that such incomplete impeachment is improper.

 Reversal for plain error requires obvious, substantial error, and should be granted only in exceptional circumstances. *United States v. Jackson,* 542 F.2d 403, 409 (7th Cir.1976); *United States v. Greene,* 497 F.2d 1068, 1077 (7th Cir.1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975). Defendant had the opportunity to object to the impeachment attempts at trial, which he exercised in all but the second allegedly improper impeachment, and he stated the reasons why he thought the testimony was consistent. We also note that the fourth allegedly improper impeachment was not completed because of an objection by defendant at a side-bar conference. Further, defendant had an opportunity to argue the consistency of the statements which the government attempted to impeach on redirect examination. Along with these safeguards to a fair trial, we find that the trial court properly instructed the jury regard-

ing the determination of defendant's credibility.[15] Moreover, we find substantial evidence, as outlined above, for the jury to convict defendant. Therefore, we do not find any plain error requiring reversal due to the government's attempts to impeach defendant.

### V. Prosecutor's Comments During Closing Argument

Finally, defendant contends that comments made by the government during closing argument to the effect that defendant sought to "gouge" I.F.I.C. and obtain "money that he didn't deserve" were improper and require reversal. Defendant also contends that the government improperly inferred that the witnesses testifying under a grant of immunity were entitled to a greater degree of credibility than others, and that the government improperly referred to certain jury instructions as the "defendant's" jury instructions. Last, defendant contends that the government improperly sought to rebut defendant's assertion that I.F.I.C. did not receive the false statements by arguing that staple holes in a letter to I.F.I.C. showed that the false statement was attached as an enclosure.

 In closing argument, the prosecutor may make any comments supported by the evidence or in reply to any argument raised by his opponent. *United States v. Jackson,* 542 F.2d 403, 410 (7th Cir.1976). Moreover, the closing argument must be viewed as a whole to determine whether any improper statements were unfairly prejudicial. *United States v. Duff,* 551 F.2d 187, 189 (7th Cir.1977); *United States v. Jackson,* 542 F.2d at 410. In order to constitute reversible error, these statements must be calculated to unfairly prejudice the defendant or suffice to alter

---

**15.** The effect of any inconsistent statements upon the defendant's credibility is a jury question. *See Riggs v. Penn Central Railroad Co.,* 442 F.2d 105, 108 (7th Cir.1971). Here, the trial court properly instructed the jury as follows:

"You are the sole judges of the credibility of the witnesses and of the weight to be given to the testimony of each of them. In consider-

ing the testimony of any witness you may take into account his intelligence, his ability and opportunity to observe, his memory, his manner while testifying, any interest, bias or prejudice he may have and the reasonableness of his testimony considered in the light of all of the evidence in the case."
Transcript, Vol. II, p. 539.

the outcome of the trial. *Berger v. United States*, 295 U.S. 78, 85, 55 S.Ct. 629, 632, 79 L.Ed. 1314 (1935); *United States v. Winograd*, 656 F.2d 279, 284 (7th Cir.1981), *cert. denied sub nom., Siegal v. United States*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); *United States v. Spain*, 536 F.2d 170, 174 (7th Cir.), *cert. denied*, 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976). Using these guidelines, we find no reversible error in the government's closing argument.

We do not find that the prosecutor's statements that defendant sought to "gouge" I.F.I.C. were calculated to improperly influence the jury's decision. The statements did not inaccurately describe the essence of defendant's actions and the closing argument as a whole was not inflammatory. Further, the jury was properly instructed as to the elements of the offenses charged, and was also instructed as to several defenses to the charges proferred by defendant. Moreover, the jury had substantial evidence upon which to base its verdict. Therefore, these statements did not constitute reversible error.

Defendant objected at trial to each of the last three allegedly improper comments, and each objection was sustained. The trial judge properly instructed the jury to disregard any evidence to which the court sustained an objection, and to disregard any comments of counsel which were not supported by the evidence. We do not find that, in light of the entire trial, the comments altered the jury's verdict or were calculated to unfairly prejudice the defendant. Therefore, these statements were not so unfairly prejudicial as to constitute reversible error.

For the reasons given herein, the judgments of conviction are affirmed.