UNITED STATES of America, Plaintiff,

v.

Martin J. DEMPSEY, et al., Defendants.

No. 89 CR 666.

United States District Court,
N.D. Illinois, E.D.

Aug. 14, 1990.

See also 768 F.Supp. 1277.

Ira H. Raphaelson, Thomas M. Durkin, Mark L. Rotert, Asst. U.S. Attys., Chicago, Ill., for U.S.

James R. Epstein, Epstein Zaideman & Esrig, P.C., Chicago, Ill., for Martin J. Dempsey.

Michael D. Sher, Neal Gerber & Eisenberg, Chicago, Ill., for James D. Nowak.

Donald C. Shine, Nissen & Elliot, Chicago, Ill., for Charles W. Bergstrom.

George B. Collins, Collins & Bargione, Chicago, Ill., for Bradley Ashman.

Nicholas F. Maniscalco, Chicago, Ill., for William A. Barcal, III.

Matthias A. Lydon, Jayne Carr Thompson, Lydon & Griffin, Chicago, Ill., for Edward A. Cox, III.

Thomas M. Breen, Martin & Breen, Oak Park, Ill., and Nan R. Nolan, Chicago, Ill., for Thomas P. Kenney.

James S. Montana, Jr., Law Offices of James S. Montana, Jr., Chicago, Ill., for Bruce W. Mittlestadt.

Gordon B. Nash, Jr., Gardner Carton & Douglas, Chicago, Ill., for John Ryan.

Robert W. Tarun, Edward L. Foote, Winston & Strawn, Chicago, Ill., for Scott Anixter.

Thomas K. McQueen, Jenner & Block, Chicago, Ill., for Joel J. Fetchenhier.

Royal B. Martin, Leigh D. Roadman, Silets and Martin Ltd., Chicago, Ill., for Sheldon Schneider.

Michael D. Monico, Monico Parich & Spevack, Chicago, Ill., for John A. Vercillo.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

The original indictment in this case was handed down on August 2, 1989 naming eighteen commodities traders in the soybean futures pit at the Chicago Board of Trade ("CBOT") and a floor clerk as defendants. The indictment charged the defendants with 534 counts alleging violations of, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Commodities Exchange Act ("CEA"), and the mail and wire fraud statutes. Five of the traders and the floor clerk entered guilty pleas. The other thirteen traders pleaded not guilty to the charges against them. These thirteen defendants filed motions to dismiss various counts of the original indictment. On February 28, 1990, before this court ruled on those motions, the first superseding indictment in this case was handed down. The first superseding indictment charged the thirteen remaining defendants with 751 counts alleging violations of the same statutes. All defendants who filed motions to dismiss under the original indictment renewed those motions as they pertained to the first superseding indictment. In addition, some defendants filed new motions to dismiss. On July 12, 1990, the second superseding indictment was handed down. The second superseding indictment charged the thirteen defendants with 742 counts alleging violations of the same statutes. The second superseding indictment dropped nine counts, but is, in all other material respects except as otherwise indicated below, virtually identical to the first superseding indictment. For the sake of simplicity, all references in this opinion to "the indictment" or to specific count numbers refer to the second

superseding indictment or counts therein unless otherwise indicated. Before the court are defendants' motions to dismiss various counts of the indictment, or alternatively as to some motions, to strike certain allegations.[1] For the following reasons, all of the motions are denied.

## I. MOTIONS TO DISMISS RICO COUNTS

In counts 749, 750, and 751, defendants Nowak, Dempsey, and Bergstrom are charged with violating one of the three substantive RICO provisions, 18 U.S.C. § 1962(c). That provision makes it a crime

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

In count one, all defendants, except Anixter and Ryan, are charged with "conspir[ing] to violat[e]" § 1962(c) in violation of 18 U.S.C. § 1962(d).

### A. Vagueness

■ Defendants Mittlestadt, Fetchenhier, Dempsey, and Nowak argue that the RICO statute is unconstitutional per se because the term "pattern of racketeering activity" is vague. "It is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975). Since first amendment rights are not involved in this case, defendants' argument that RICO is unconstitutionally vague per se is without merit.

The only vagueness challenge which defendants may assert is that the RICO statute "fails to give a person of ordinary intelligence fair notice that *his* contemplated conduct was forbidden." *United States v. Harriss*, 347 U.S. 612, 617, 74

---

**1.** Each defendant has filed a motion to adopt all motions filed by his codefendants which may inure to his benefit. All of these motions are granted. Thus, this opinion applies to all defendants.

S.Ct. 808, 812, 98 L.Ed. 989 (1954) (emphasis added). All of the RICO defendants assert this "as applied" argument. They argue that the RICO statute fails to inform them that the conduct with which they are charged constitutes a "pattern of racketeering activity". The RICO statute defines the term "racketeering activity" as a violation of any of a number of expressly defined offenses under state and federal law. 18 U.S.C. § 1961(1). These offenses are commonly referred to as predicate acts. The predicate acts charged in this case are violations of the federal mail fraud and wire fraud statutes. The RICO statute defines the term "pattern of racketeering activity" as follows: " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after [October 15, 1970] and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Defendants do not argue that the statutory definition of "racketeering activity" is vague. Rather, they argue that the statutory definition of what constitutes a "pattern" of such activity is vague.

The Supreme Court has never addressed the constitutionality of the RICO statute either per se or as applied. It has, however, defined the term "pattern of racketeering activity" in other contexts. In *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), the issue before the Court was the scope of the express private right of action which the RICO statute affords private individuals. The Court acknowledged that the issue of "whether the commission of [the alleged predicate acts] fell into a pattern" was not before it. However, at footnote fourteen, the Court observed in dictum:

> [T]he definition of a 'pattern of racketeering activity,' ... states that a pattern *'requires'* at least two acts of racketeering activity, ... not that it 'means' two such acts. The implication is that while two acts are necessary, they may not be sufficient. Indeed, in common parlance two of anything do not generally form a 'pattern.' The legislative history supports the view that two isolated acts of

racketeering activity do not constitute a pattern. As the Senate Report explained: 'The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one "racketeering activity" and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern.' S.Rep. No. 91–617, p. 158 (1969).... Similarly, the sponsor of the Senate bill, after quoting this portion of the Report, pointed out to his colleagues that '[t]he term "pattern" itself requires the showing of a relationship.... [P]roof of two acts of racketeering activity, without more, does not establish a pattern....' 116 Cong.Rec. 18940 (1970).... Significantly, in defining 'pattern' in a later provision of the same bill, Congress was more enlightening: 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' 18 U.S.C. § 3575(e). This language may be useful in interpreting other sections of the Act. Cf. *Iannelli v. United States*, 420 U.S. 770, 789 [95 S.Ct. 1284, 1295–96, 43 L.Ed.2d 616] (1975).

*Sedima*, 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14 (emphasis in original).

In *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), the Court held that a civil RICO plaintiff need not allege multiple schemes to sufficiently allege a "pattern of racketeering activity". In the course of reaching this conclusion, the Court noted that its footnote fourteen in *Sedima* had spawned various lower courts' attempts to define exactly what it is that constitutes such a "pattern". The Court then elaborated at length on what course of racketeering conduct constitutes a "pattern".

The Court began its analysis with the statutory language, observing that § 1961(5) "concerns only the *number* of

predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern *beyond* simply the number of predicate acts involved.... Section 1961(5) does not identify, though, these additional prerequisites for establishing the existence of a RICO pattern." *Id.*, 109 S.Ct. at 2899–2900 (emphasis in original). The Court began its attempt to identify "these additional prerequisites" by relying on the "ordinary meaning" of the word "pattern" as indicated by a dictionary definition:

In normal usage, the word 'pattern' here would be taken to require more than just a multiplicity of racketeering predicates. A 'pattern' is an 'arrangement or order of things or activity,' 11 Oxford English Dictionary 357 (2d ed. 1989), and the mere fact that there are a number of predicates is no guarantee that they fall into any arrangement or order. It is not the number of predicates but the relationship that they bear to each other or to some external organizing principle that renders them 'ordered' or 'arranged'.

*Id.*, 109 S.Ct. at 2900. The Court then noted that the text of RICO "conspicuously fails anywhere to identify ... forms of relationship or external principles to be used in determining whether racketeering activity falls into a pattern for purposes of the Act." *Id.* From this absence, the Court concluded as follows:

It is reasonable to infer ... that Congress intended to take a flexible approach and envisaged that a pattern might be demonstrated by reference to a range of different ordering principles or relationships between predicates within the expansive bounds set [by § 1961(5) and the absence of a textual definition of "pattern"].

*Id.* Turning to the legislative history of RICO, the Court observed as follows: "Congress[ ] inten[ded] that to prove a pattern of racketeering activity, a plaintiff or prosecutor must show that the racketeering predicates are related [to each other] *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original); *see also Sedima*, 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14.

For assistance in defining the relationship element of a "pattern", the Court, picking up on its dictum in footnote fourteen in *Sedima*, turned to Congress' definition of the term "pattern of criminal conduct" in Title X of the Organized Crime Control Act of 1970 (of which RICO constitutes Title IX). That term is defined as follows: " 'criminal conduct forms a pattern if it embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.*, 109 S.Ct. at 2901, *quoting* 18 U.S.C. § 3575(e). The Court concluded as follows: "We have no reason to suppose that Congress had in mind for RICO's pattern of racketeering component any more constrained a notion of relationship between predicates that would suffice." *Id.*, 109 S.Ct. at 2901.

Noting that § 3575(e) "is of no assistance" in defining the continuity element of "pattern", the Court defined that element on its own as follows:

'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition.... It is, in either case, centrally a temporal concept and particularly so in the RICO context where *what* must be continuous, RICO's predicate acts or offenses, and the *relationship* these predicates must bear one to another, are distinct requirements. A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct.

*Id.* at 2902 (emphasis in original).

Each of the more than 200 mail and wire fraud predicate acts charged in this indictment were allegedly committed by these same eleven defendants for the same pur-

pose: to defraud customers and avoid liability for trading errors. The victims of the scheme in furtherance of which these mailings and/or wires were sent were also the same: brokers' customers. The trades which form the basis of the mail and wire fraud predicate acts were also "committed" by a similar method: by executing customers' orders, not competitively by open outcry, but noncompetitively, e.g., by prearrangement. The result of the scheme was also the same: the victim-customers lost money which would have been theirs if the defendants had executed their trades competitively. There is no doubt that the predicate acts in this case are "related" as the *H.J. Inc.* Court has defined that term. With regard to the "continuity" element of "pattern", the indictment alleges that the predicate acts were committed from December of 1986 through the date of the indictment. Even under the original indictment, that is a closed time period of more than two-and-a-half years. That is certainly a "substantial period of time" extending over more than "a few weeks or months." *H.J. Inc.*, 109 S.Ct. at 2902. A person of ordinary intelligence would be on notice that more than 200 related predicate acts committed over a two-and-a-half-year period fall into a "pattern". There is nothing vague about the term "pattern of racketeering activity" as applied to these defendants' alleged conduct.

## B. Failure to State Offense

■ When ruling on a motion to dismiss charges in an indictment for failure to state an offense, the indictment must be examined *as a whole* in order to determine whether it adequately informs the defendant of the charges against him. *United States v. Brack*, 747 F.2d 1142, 1147 (7th Cir.1984) (emphasis added). Furthermore, an indictment need only include those facts and elements which are necessary to state an offense and enable the defendant to prepare a defense and invoke the double jeopardy clause as a bar to a subsequent prosecution for the same conduct. *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *United States v. Neapolitan*, 791 F.2d 489,

501 (7th Cir.1986). When analyzing a RICO indictment, it is important to note that the seventh circuit has repeatedly held that RICO is a broad statute which should be liberally construed to effectuate its remedial purpose. *Neapolitan* at 495.

### 1. Enterprise Element

Defendants Cox and Vercillo argue that the government has "abuse[d] the enterprise concept to improperly link multiple conspiracies." As such, they argue, the indictment violates their fifth amendment due process right to "fundamental fairness" and Fed.R.Crim.P. 8(b). Rule 8(b) provides in relevant part: "Two or more defendants may be charged in the same indictment ... if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses...."

■ Defendants' argument is that the government has defined the RICO enterprise "too broadly". The result of this, argue defendants, is that the indictment charges multiple separate conspiracies rather than one conspiracy in which all defendants participated. In Cox's words, "the only common agreement among the defendants is to participate in the business of the CBOT—a legitimate and legal agreement." In the same vein, Vercillo argues that "[t]he tie that supposedly binds these defendants is that they all worked within the soybean pit at the [CBOT]". According to Vercillo's reading of the indictment, the indictment "belies any allegation that all [eleven RICO] defendants agreed among each other to carry on illegal activity, suggesting only that unitary clusters of defendants engaged in their own patterns of illegal activity apart from the designs of others." Perhaps Cox and Vercillo skipped paragraph two of count one in their perusal of the indictment. That paragraph alleges that all eleven RICO defendants "conspire[d] and agree[d] *with each other* ... to conduct and participate in the conduct of the affairs of the CBOT, directly and indirectly, through a pattern of racketeering activity ... consisting of multiple acts of mail fraud and wire fraud." (Emphasis

**1264**

added). It may be true that the concept of enterprise liability enables the government to charge multiple conspiracies in a single indictment. *Neapolitan* at 501 (§ 1962(d) is "capable of providing for the linkage in one proceeding of a number of otherwise distinct crimes and/or conspiracies through the concept of enterprise conspiracy") (dictum). This court need not determine whether the fact that RICO may *enable* the government to charge multiple conspiracies violates any of defendants' constitutional or procedural rights, because the indictment in this case clearly alleges only one conspiracy to conduct and participate in the conduct of the affairs of a legitimate enterprise in an illegal manner. In this situation, joinder under Rule 8(b) is proper. *United States v. Briscoe*, 896 F.2d 1476, 1515 (7th Cir.1990). At the pleading stage, the government need not demonstrate sufficient evidence supporting joinder, in this case that the defendants were members of a single conspiracy. *Id.* The government will have to so demonstrate at trial.

Defendants Cox and Vercillo also argue that they are charged with RICO conspiracy simply because of their "status" as members of a legitimate enterprise, the CBOT. This argument ignores the "pattern of racketeering element" of RICO conspiracy. Defendants are charged with RICO conspiracy not because they are members of a legitimate enterprise, but because they allegedly conducted and participated in the affairs of a legitimate enterprise *in an illegal manner.*

### 2. Pattern Of Racketeering Activity Element

Defendant Kenney argues that count one fails to state an offense because it does not identify any predicate acts. The relevant charging language of count one is as follows: "[the predicate acts] consist[ ] of multiple acts of mail and wire fraud ... as more fully described in the mail and wire fraud counts contained in this indictment." Kenney's argument is that "it is [irrelevant] that count [one] states that the mail and wire fraud acts are more fully described elsewhere in the indictment. Plainly, count [one] does not incorporate by

reference other counts in the indictment." Thus, Kenney's argument is that since count one does not contain the magic words "incorporated by reference" in connection with the alleged mail and wire fraud predicates, count one does not allege any predicates. This argument is nonsensical. In any case, Kenney's argument was made towards the original indictment. In the superseding indictment, count one expressly incorporates the mail and wire fraud counts by reference using the magic words.

Defendant Schneider also argues that count one fails to allege any predicate acts. Schneider's argument is that, for reasons stated in a separate motion filed by him, the mail and wire fraud counts of the indictment fail to properly charge those offenses. For the reasons explained *infra* in this memorandum opinion, the mail and wire fraud counts are properly pleaded and Schneider's argument is thus without merit.

Although defendant Barcal argues that the RICO conspiracy count is unconstitutional as applied to him, his argument is really that that count fails to state an offense because it does not allege a "pattern of racketeering activity". Barcal's argument is that "trading at the CBOT is not a 'racketeering activity' as defined by 18 U.S.C. Section 1961(1)". Thus, reasons Barcal, no "pattern" of such activity can be established. Barcal and his co-defendants are not charged with simply "trading at the CBOT." They are charged with doing so in a manner which allegedly defrauded customers and threatened the integrity of the soybean futures market. Barcal's argument is without merit.

Bergstrom argues that count one fails to state an offense because it "fails to identify the date, place, and persons involved in the purported agreement". Similarly, Kenney argues that "no meaningful particulars of the alleged criminal activity are alleged. Allegations such as times, dates, places and specific criminal acts, necessary to know the nature of the charges and prepare a defense, simply are lacking...." This situation, argues Kenney,

violates both the sixth amendment and Fed. R.Crim.P. 7(c)(1). The sixth amendment provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right ... to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. Rule 7(c)(1) requires that an indictment shall be "a plain, concise and definite written statement of the essential facts constituting the offense charged." The allegations in the indictment satisfy these requirements. Paragraph two of count one alleges that defendants Dempsey, Nowak, Bergstrom, Ashman, Barcal, Cox, Kenney, Mittlestadt, Fetchenhier, Schneider, and Vercillo (i.e., "the persons") "did knowingly conspire and agree with each other" "from in or about December 1986 through on or about the date of this indictment [i.e. the date] at Chicago ... and elsewhere [i.e. the place]." Furthermore, since the indictment must be viewed as a whole to determine if it states an offense, *United States v. Brack* at 1147, the allegations in count two, the initial mail fraud count, are also relevant. The allegations in that count contain a myriad of detail about the "alleged criminal activity". Each subsequent mail and wire fraud count in turn details the date of each transaction and the parties involved. All of this information, taken together, constitutes enough "essential facts" to inform defendants of the "nature" of the RICO conspiracy charge against them.

■ Defendant Ashman's motion, filed before the first superseding indictment was handed down, argues that count one does not properly charge him because it "does not allege that [he] agreed to the commission of any particular predicate act." At the time Ashman filed his motion, the only substantive counts charged against him were thirteen violations of the CEA and a false statement charge, none of which are predicate acts under RICO. The first superseding indictment added, *inter alia*, four mail fraud counts against him. Both the original and superseding indictments allege that he, in agreement with his alleged coconspirators, agreed to cheat customers and avoid liability for trading errors through a pattern of racketeering activity consisting of more than 200 counts of mail and wire fraud. That is enough to state a RICO conspiracy offense. He need not have agreed to the commission of any "particular predicate act". Even if there were such a requirement, however, he is now charged with *actually* committing four such acts. This fact eviscerates his argument that the indictment fails to allege that he *agreed* to the commission of any particular predicate act.

■ Defendant Kenney argues that count one should be dismissed against him because it does not allege that he *personally* agreed to commit two predicate acts. Kenney acknowledges that the seventh circuit has held that such an agreement is not a prerequisite to RICO conspiracy liability, *Neapolitan* at 497–498, but "note[s] that there is a definite circuit split on the issue." A circuit split would concern this court only if the seventh circuit had not spoken on this issue.

## C. Prosecutorial Vindictiveness

Defendant Barcal was not charged with RICO conspiracy in the original indictment. He was so charged in the first and second superseding indictments. He argues that

> [t]he only reason the Government chose to include [him] ... in the RICO conspiracy ... in the superseding indictment was because he would not acquiesce to the Government's proposals to plead guilty to the [original] indictment and cooperate with the Government's on-going investigation.

Thus, reasons Barcal, he is being punished "for doing something the law plainly allows him to do, i.e. plead not guilty and assert his Fifth Amendment Rights." Barcal asserts that he is entitled to a presumption of prosecutorial vindictiveness, an evidentiary hearing to prove the truth of this presumption, and once he does just that, dismissal of count one against him.

The Supreme Court has spoken on the issue of prosecutorial vindictiveness several times. In *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), the defendant was convicted of a misdemeanor.

Following his conviction, he exercised his statutory right to have that conviction reviewed *de novo* by a trial court with felony jurisdiction. After the defendant filed his notice of appeal, the prosecutor obtained a felony indictment against him. On these facts, the Court held that a *presumption* of prosecutorial vindictiveness was warranted. Such vindictiveness, the Court said, violates a defendant's fourteenth amendment due process rights.

In *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the defendant was charged with various misdemeanor offenses, including assault, arising from a traffic stop and a subsequent high-speed chase. After the defendant demanded a jury trial, the prosecutor obtained another indictment which included a felony count of forcibly resisting an officer. A jury convicted the defendant of the felony count. The defendant asked the Supreme Court to apply the presumption of vindictiveness it had applied in *Blackledge* to the facts of his case. The Court declined to do so, distinguishing the facts of the case before it from *Blackledge* as follows:

At [the pretrial] stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the [government] has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information of the extent to which he should be prosecuted. Thus, a change in the charging decision made after an initial trial is completed is much more likely to be improperly motivated than is a pretrial decision.

In addition, a defendant before trial is expected to invoke procedural rights that inevitably impose some 'burden' on the prosecutor. Defense counsel routinely file pretrial motions to suppress evidence; to challenge the sufficiency and form of an indictment; ... to be tried by jury....

· · · · ·

The possibility that a prosecutor would respond to a defendant's pretrial demand for a jury trial by bringing charges not in the public interest that could be explained only as a penalty imposed on the defendants is so *unlikely* that a presumption of vindictiveness certainly is not warranted.

*Goodwin*, 457 U.S. at 381, 384, 102 S.Ct. at 2493, 2494 (emphasis in original).

■■■ The facts in this case are not significantly distinguishable from those in *Goodwin*. In both cases, a defendant who had demanded a jury trial was subsequently charged with a more serious offense before he was tried. Thus, Barcal's argument that he is entitled to a presumption of prosecutorial vindictiveness is without merit.

■■■ The government's explanation for its decision to charge Barcal with RICO conspiracy in the superseding indictments is that "other cooperating traders have provided information [since the original indictment] demonstrating that Barcal's behavior as a trader was marked by repetitive and deliberate fraudulent conduct on his part." This court also notes that defendants Anixter and Ryan, like defendant Barcal, were not charged with RICO conspiracy in the original indictment, and like defendant Barcal, also pleaded not guilty and demanded a jury trial. Notwithstanding this, they were not charged with RICO conspiracy in the superseding indictments. This fact indicates that the government has not acted vindictively with respect to Barcal.

Barcal offers no evidence whatsoever to refute the government's very plausible explanation of its pretrial decision to charge him with RICO conspiracy. Since he has neither a presumption of vindictiveness nor any evidence of vindictiveness, he is not entitled to an evidentiary hearing to support his claim.

## II. MOTIONS TO DISMISS MAIL AND WIRE FRAUD COUNTS

All defendants are charged with violating the mail and/or wire fraud statutes.

The mail fraud statute provides in relevant part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service ... or knowingly causes to be delivered by mail according to the direction thereon ... shall be [guilty of a crime].

18 U.S.C. § 1341.

The wire fraud statute provides in relevant part:

> Whoever, having devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... transmits or causes to be transmitted by means of wire, radio, or television communication in interstate ... commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be [guilty of a crime].

18 U.S.C. § 1343.

On November 18, 1988, Congress enacted 18 U.S.C. § 1346 which provides: "For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

## A. *Ex Post Facto* Issue

The relevant charging language in this case is in paragraphs one through forty of count two. These paragraphs are incorporated by reference into each of the subsequent mail and wire fraud counts. Paragraph fourteen of count two reads as follows:

> 14. Beginning in or about December 1986 and continuing until the date of this indictment, at Chicago, in the Northern District of Illinois, Eastern Division, [the defendants], together with other co-schemers known ... and unknown to the grand jury devised and intended to devise a scheme and participated in a scheme:
>
> (a) to defraud and obtain money and property by means of false and fraudulent pretenses, representations and promises, well knowing at the time that the pretenses, representations and promises would be and were false when made; and
>
> (b) Between November 18, 1988 and the date of this indictment:
>
> 1. to defraud customers of the customer's right to the loyal, honest, disinterested and conflict-of-interest-free services of the broker, and
>
> 2. to defraud the investing public of its right to the honest services of traders in the execution of orders in the marketplace at the CBOT.

In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court held that the mail fraud statute did not reach fraudulent conduct which deprived an individual of a so-called "intangible right", e.g., a citizen's right to honest government. Rather, said the *McNally* Court, the statute prohibited only fraudulent conduct which deprived an individual of property rights. *McNally* remained the law of the land until November 18, 1988, when Congress overruled it by enacting § 1346, *supra*. Thus, the propriety of a mail or wire fraud count based on a mailing or wire which was sent before November 18, 1988 is analyzed under *McNally*. The propriety of a mail or wire fraud count based on a mailing or wire which was sent on or after November 18, 1988, is analyzed under § 1346 and pre-*McNally* case law.

 Defendants Dempsey, Nowak, Ryan, and Anixter argue that:

> [i]f the scheme alleged in Count 2 is viewed as a unitary whole, of which all the alleged uses of the mails and wires are claimed to be in furtherance, then the charges relating to uses of the mails or wires prior to November [18], 1988 violate the *ex post facto* clause.

This, defendants argue, is because the indictment "charge[s] [the] defendant[s] under the current, [i.e., post-November 18, 1988] version of the mail fraud statute in connection with a use of the mails that predated [November 18, 1988]." A law which is not applied to conduct occurring before its enactment does not violate the *ex post facto* clause. *Weaver v. Graham*, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981). Thus, if the language "[b]etween November 18, 1988 and the date of this indictment" did not preface subparagraph 14(b) of count two, defendant's argument would have merit. That prefatory language is there, however, and notwithstanding defendants' protestations to the contrary, that language obviates the potential *ex post facto* problem of which they now complain. Defendants are charged with a scheme which had three objectives. At the appropriate time in these proceedings, this court will instruct the jury that the two intangible rights objectives alleged in subparagraph 14(b) can only be considered in the context of mailings or wires which were sent on or after November 18, 1988. If the jurors follow the instructions, which this court must presume they will do, *United States v. Napue*, 834 F.2d 1311, 1325 (7th Cir.1987), then defendants' *ex post facto* rights will not have been violated.

B. Failure to State Offense

There are two elements of a mail or wire fraud charge: (1) a scheme to defraud, and (2) a mailing or wire in furtherance of the scheme. *Messinger v. United States*, 872 F.2d 217, 221 (7th Cir.1989). Defendants argue that the government has failed to allege either of these elements.

*1. Scheme To Defraud*

Defendants Dempsey, Nowak, Anixter, and Ryan argue that the mail and wire fraud charges are "duplicitous" [sic]. Defendants reason that:

[if] ... the scheme is not viewed as a unitary whole [but rather as a scheme with two "separate heads"], then the mail and wire fraud charges contain two separate offenses ... [i.e.,] a violation of

a statute that existed prior to November [18], 1988, but no longer exists in that form; and a violation of another statute that did not come into being until November [18], 1988.

Defendants are correct in stating that more than one offense may not be alleged in the same count. Fed.R.Crim.P. 8(a). When a defendant argues that a charge against him is duplicative, the issue is "whether or not [the indictment] alleg[es] in one count the commission of multiple acts in violation of the same statutory provision, or [alleges] separate and distinct offenses ... in the same count." *United States v. Orzechowski*, 547 F.2d 978, 986 (7th Cir.1976). The former situation is proper, the latter is not. One reason for this is that when a charge is duplicative, the jury's verdict on such a count will "not reveal whether [it] found the defendant guilty of both or one or the other of the offenses charged." *Id.* In the case at bar, the mail and wire fraud counts do not allege two offenses in the same count. Rather, as to post-November 18, 1988 mailings and wires, they allege multiple fraudulent objectives in violation of one statute, either § 1341 or § 1343. Defendants' duplicative charging argument is without merit.

Defendants Dempsey, Nowak, Ryan, and Anixter argue that, even if the mail and wire fraud charges are not facially defective, the " 'intangible rights' aspect" of these charges "are, on their face, wholly superfluous to any and all of the alleged acts of mail and wire fraud that were sent prior to that date" because the vast majority of the mailings and wires alleged in the indictment were sent before November 18, 1988. Thus, argue defendants, the "intangible rights" language should be stricken. A motion to strike surplusage should not be granted unless "the targeted allegations are clearly not relevant to the charge and are inflammatory and prejudicial." *United States v. Chaverra–Cardona*, 667 F.Supp. 609–611 (N.D.Ill.1987). By this court's count, there are at least fourteen post-November 18, 1988 mail and wire fraud counts. (Counts

655, 659, 663, 667, 677, 682, 688, 693, 697, 700, 704, 707, 710, 715). Defendants' argument that the "intangible rights" language is "utterly irrelevant and immaterial to the mail and wire fraud charges against these defendants" is thus without merit. On the contrary, the intangible rights language could not possibly be more relevant to these fourteen charges. The fact that approximately 200 other counts allege pre-November 18, 1988 offenses does not make this relevant language "wholly superfluous". Defendants argue that they are "severely" prejudiced, by the intangible rights language because it "suggest[s] [to the jury] that ... defendants [charged only with pre-November 18, 1988 offenses] were part of a scheme that included the defrauding of customers and the public's purported 'intangible rights.' " The jury will be properly instructed to the contrary.

■ Defendant Cox argues that the mail and wire fraud charges fail to state an offense, because none of the three objectives alleged in paragraph fourteen of count two "can be the basis of a valid indictment." Cox argues that subparagraph 14(a) "fails to identify any persons or entities who were defrauded of money, and the indictment does not elsewhere describe what persons or entities were defrauded of what money by the defendant". In so arguing, Cox overlooks paragraph fifteen of count two. That paragraph states in relevant part that, as part of their scheme to defraud, defendants "would engage in various illegal trading practices at the expense of and to the financial detriment of the brokers' customers in order to ... convert customer funds and market opportunities to their own use and the use of others." Each separate mail or wire fraud count in turn specifies the date on which the mailing or wire in furtherance of the scheme was sent and the name of the customer to whom the mailing was sent or in connection with whose account the wire was made. Defendant Cox's argument that the indictment does not identify anyone who was defrauded or of what they were defrauded is without merit.

■ Cox next argues that subparagraph 14(b)(1) of count two is insufficient to state a claim under the mail or wire fraud statutes because it "overstates any legal obligation that [he] had toward any customer." Cox argues that because the CEA permits floor brokers to trade for their own accounts, "it can never be urged that the customer has any right to the floor broker's loyalty, disinterest, or lack of conflicts of interest." Rather, argues Cox, the broker's duty to the customer is "to fill the order by execution at the best price obtainable under market conditions of the moment." Cox's argument is astonishing. In *United States v. Dial*, 757 F.2d 163 (7th Cir.1985), the broker-defendant conceded that he was a fiduciary of his customers by virtue of the fact that he was their broker. The seventh circuit parenthetically observed that the defendant-broker "must" so concede, citing a ninth circuit case which had held that a broker is a fiduciary of his customers. Thus, if Cox's argument is that he did not owe his customers a fiduciary duty, he is wrong. The fact that he also owed his customers a duty in the nature of a duty of care to get them "the best price obtainable under market conditions" does not change the fact that he also owed them a fiduciary duty. If Cox's argument is that a person who owes a fiduciary duty to an individual does not owe that individual his undivided loyalty, he is again wrong. Undivided loyalty is the essence of a fiduciary duty. *See e.g., S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963) (fiduciary owes clients an "affirmative duty of 'utmost good faith and full and fair disclosure of all material facts....' ").

■ Cox raises two arguments about the sufficiency of subparagraph 14(b)(2). First, he argues that subparagraph 14(b)(2) "incorrectly characterizes the marketplace for commodity futures as an investment vehicle." This argument is so patently meritless that it does not warrant further discussion by this court. Cox's second argument, also asserted by defendants Dempsey, Nowak, Anixter, Ryan, and Mittlestadt, is that the "investing public" allegations are insufficient because "as a mat-

ter of law, the defendant[s] ha[ve] no relationship with the investing public which gives rise to a duty toward the public." They contend that "none of the pre-*McNally* case law had recognized, in the context of a mail or wire fraud prosecution, a 'public right to honest markets'." The government argues that *Dial* contradicts defendants' contention. In *Dial,* the defendants engaged in a fraudulent scheme involving trades of silver futures contracts at the CBOT. The court held that the defendants' failure to disclose their scheme to their employer was a breach of a fiduciary duty which they owed to their employer. Thus, their scheme was actionable under the mail and wire fraud statutes pursuant to an intangible rights theory. The seventh circuit nevertheless continued:

> Although [defendants] owed no [fiduciary] duty to people on the other side of the silver transactions [i.e., investors who were not their customers], their trading an unmargined account was an active misrepresentation and hence actionable *even without a breach of fiduciary duty.*

*Id.* at 169 (emphasis added). Defendant Cox replies to the government's citation of *Dial* by simply pointing out that the above-quoted language is dictum. Defendants offer no reasoned analysis, however, as to why this court should not follow this dictum.

Even if defendants' argument that no pre-*McNally* cases support the "investing public" allegation were correct, that fact would not help them. That is because their argument assumes that the existence of a common law duty is a necessary prerequisite to their indictability on an intangible rights theory. If this assumption were accurate, then an individual could defraud someone of an intangible right free from the constraints of the mail and wire fraud statutes so long as that individual did not owe the victim any kind of a common law duty. The fact is that the post-November 18, 1988 mail and wire fraud statutes impose a statutory duty on everyone not to defraud anyone of an intangible right to honest services by utilizing the mails or

wires. Certainly, people who invest in commodities futures have the right to expect that members of a federally-regulated contract market are conducting their business affairs honestly in accordance with, rather than in contravention of, applicable federal statutes and regulations.

■ Defendants Anixter and Mittlestadt argue that the mail and wire fraud counts of the indictment should be dismissed because of the government's addition of the words "and property" in subparagraph 14(a) of the superseding indictment. Alternatively, they argue that that language should be stricken. In subparagraph 14(a) of the original indictment, the government alleged that the defendants schemed to deprive their customers only of "money". Thus, defendants' argument is that, with the inclusion of the words "and property" into paragraph 14(a) of count two, the mail fraud counts all of a sudden fail to state an offense.

Defendant Anixter argues as follows:

> The only "property" that a victim could have lost as a result of the activities described in the mail fraud counts is money. Accordingly, the addition of the words "and property" to paragraph 14(a) must be read as an assertion by the government that violations of various [Commodity Futures Trading Commission] and CBOT rules could constitute mail fraud, even absent monetary loss.

This court is of the opinion that Anixter's interpretation of the "and property" language is not one which "must" be drawn, but rather one which stretches the imagination. The terms "money" and "property" are often used interchangeably. *See e.g. Bateman v. United States,* 875 F.2d 1304, 1306, and n. 2 (7th Cir.1989). Both words are taken directly from the mail and wire fraud statutes. The inclusion of both words in the indictment is not "highly prejudicial" as Anixter claims, but rather entirely proper. As defendant Mittlestadt keenly observes, "[t]he government's inclusion of the 'and property' language in the superseding indictment adds nothing to its original charge." This court agrees. In,

such a situation, neither dismissal nor striking is warranted.

▬ Defendant Cox argues that "particulars are lacking" with regard to "a variety" of illegal trading practices described in various paragraphs of count two. The particulars which Cox wants are "times and trades." Cox points to subparagraph 17(a) of count two and argues as follows: "Thus while [sub]paragraph 17(a) describes a practice known as 'front running' a customer order, no order is identified and a defendant cannot know what facts form the basis for the allegations." In so arguing, Cox ignores the fact that subparagraph 17(a) in and of itself does not charge either himself or any other defendant with anything. Paragraphs one through forty of count two are incorporated into each subsequent mail and wire fraud count. Each such count in turn contains the "time and trade" particulars which Cox wants. His argument is thus without merit. Cox's similar complaints about subparagraphs 17(g) (describing curb trading) and 17(j) (describing fictitious trading), again viewing those subparagraphs apart from their incorporation into any specific count against him, are similarly meritless.

Next Cox complains about paragraph nineteen of count two. Paragraph nineteen states in relevant part: "It was ... part of the scheme that the defendants would fill customer orders and otherwise execute trades off the market, that is ... not by open outcry, in order to facilitate the theft and misappropriation of *customer funds* and market opportunity." (Emphasis added). Cox's argument is that a "market opportunity" is an "intangible expectation which the [pre-November 18, 1988] mail and wire fraud statutes don't reach unless customer money or property is also obtained." This argument ignores the "customer funds" language in paragraph nineteen which immediately precedes the "market opportunity" language to which Cox objects.

▬ As his final catchall argument directed at the scheme element of the mail and wire fraud counts, Cox argues as follows:

> The incorporated paragraphs [paragraphs one through forty of count two] further confuse the import of the individual counts by including language descriptive in general statutory words of numerous regulations and other statutes, but utterly failing to describe what the defendant did in plain concise facts with respect to each count. For example, defendant cannot know with respect to count 230 [count 272 in the superseding indictments] whether he is to defend against having filled orders by offset, as paragraphs 13(a)(D), 13(c), and 13(d) [of count two] might suggest; or whether he is to defend against a curb trade as paragraphs 17(g) and 25 might suggest.[2]

This argument is without merit. Count two describes a detailed pervasive scheme to defraud in which various illegal practices were employed. Defendants are not entitled to know which of these illegal practices was allegedly committed with respect to each count. They can adequately prepare their defense without this information.

Defendant Anixter argues that the mail fraud counts against him should be dismissed "[b]ecause no customers were deprived of their property as a result of these transactions." Anixter explains each of the transactions which form the basis of these counts as he views them and, not surprisingly, concludes that no customers lost money or property. The problem with this argument is that the indictment alleges otherwise. Unless and until Anixter waives his right to a jury trial, this court cannot resolve factual disputes in his favor.

### 2. In Furtherance Element

▬ When analyzing the sufficiency of a mail or wire fraud charge for "in furtherance" purposes,

> [t]he question is not whether the indictment particularly alleges sufficient facts

---

**2.** Defendant Schneider also complains about the effect of incorporation by reference. His memorandum, however, fails to apply the law he cites to the facts of this case. This court is thus unable to determine what it is about incorporation by reference which bothers him.

from which a jury could find that the mailings charged were in furtherance of the scheme, but rather whether the Government conceivably could produce evidence at trial showing that the designated mailings were for the purpose of executing the scheme. *United States v. Castor,* 558 F.2d 379, 384 (7th Cir.1977), *citing United States v. Sampson,* 371 U.S. 75, 76, 83 S.Ct. 173, 173–74, 9 L.Ed.2d 136 (1962). "The resolution of the question of whether the alleged mailings were in furtherance of the scheme must await trial 'unless it so convincingly appears on the face of the indictment that as a matter of law there [is] no necessity for such delay.'" *Castor* at 384 (citation omitted). Accordingly, "[t]he Government need not allege the subordinate evidentiary facts by which it intends to prove the 'in furtherance' element of the crime charged...." *Castor* at 385.

■ Defendants Dempsey, Nowak, Anixter, and Ryan argue that the mail and wire fraud charges should be dismissed because they fail to sufficiently allege the "in furtherance" element. Their argument is as follows:

If a fraud occurred, it was finished when the defendants completed the trades in question. The mailing of a[ ] [confirmation] which, according to the indictment, did nothing more than report the trade, did not further the fraud in any way. It was not 'for the purpose of executing' the alleged scheme.

The government argues that the case of *Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) is factually on point and conclusively refutes defendants' "in furtherance" argument. In *Schmuck,* a wholesale used car dealer rolled back the odometers on used cars and then sold the cars to retail dealers. When the retailer sold one of the cars to a customer, the retailer would mail a title application form to the state's transportation department on the customer's behalf. Receipt of the title was a prerequisite to completing the retailer-customer deal. The defendant-wholesaler argued that the title application mailings were not in furtherance

of the alleged fraud because the fraud was already completed when they were mailed. The Court disagreed:

[A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was *essential* to the perpetuation of [the defendant-wholesaler's] scheme.

. . . . .

[A] failure in this passage of title would have jeopardized [the defendant-wholesaler's] relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended.

*Id.,* 109 S.Ct. at 1448–49 (emphasis added). Defendants attempt to distinguish *Schmuck* as follows: "In contrast [to the mailings in *Schmuck* ], the mailing of confirmation statements from brokerage firms to customers ... was not necessary to the passage of title...." Defendant's contention that their mailings were not necessary to the passage of any title is correct. That is because, unlike the case with cars, no title documents are necessary to pass title to money. But this fact does not mean that *Schmuck* does not dictate the result in this case. The *Schmuck* court's holding was that the mailings were "essential" to the continued success of the scheme. The reason why it was essential on the facts in *Schmuck* was because the passage of title was essential to that particular scheme. Beyond the conclusory contention that the confirmations mailed in this case were not "essential to the alleged fraudulent scheme", defendants do not address this crucial issue.

If the government's allegations against these defendants are true, there is certainly "conceivable" in furtherance evidence which the government could adduce from which a jury could find that the confirmation mailings were "essential" to the success of the defendants' scheme. Defendants characterize the confirmation mailings as truthful and accurate confirmations of the terms of the trades which were executed. This characterization is only partially correct. It is true that everything

about the trades which is reported in the confirmations is accurate. However, if the government's allegations are true, there are a few other accurate aspects of these trades which are not reflected in the confirmations, namely, the fact that each one was executed in an illegal manner. Thus, these confirmations contained the truth, but not the whole truth. The reason why they did not contain the whole truth is obvious: if the confirmations not only reported the trade which actually occurred, but also reported the fact that the trade was illegal because, for example, it was prearranged, several undesirable results might have ensued. For example, (1) the customers who placed the orders might not have placed any more orders with the brokerage firms whose brokers executed the trades illegally, (2) the affected brokerage firms might have been unhappy with such an occurrence and might have fired the brokers who executed the orders, and (3) the scheme to defraud would have abruptly ended because each of the perpetrators would have been apprehended. A jury could thus conclude that the omission from the confirmations of the material fact that the trades were executed illegally concealed the fact that the scheme was being perpetrated. Concealment is certainly an "essential" aspect of any scheme to defraud.

In any case, even if the *Schmuck* court had accepted the wholesaler-defendant's argument and held that the mailings were not in furtherance of the scheme alleged in that case, that fact would not help defendants here. This is because *Schmuck* involved the issue of whether the government had *proved* the "in furtherance" element at trial, not whether the government sufficiently *alleged* that element in the indictment. As explained above, the standard of review in the latter situation is extremely liberal: a mail fraud indictment should not be dismissed for failure to sufficiently allege the "in furtherance" element unless there is no conceivable evidence that the government could adduce at trial in support thereof. In this case, as discussed above, there is certainly conceivable "in furtherance" evidence.

Schneider's "in furtherance" argument is that: (1) he did not "cause" the confirmations to be mailed because federal regulations and CBOT Rules require that confirmations be sent to customers,[3] and (2) because these mailings were required by law to be sent, they cannot form the basis of a mail fraud charge unless the mailings themselves are false. Barcal makes an identical argument. Schneider acknowledges that the seventh circuit has expressly rejected this argument in *United States v. Green*, 786 F.2d 247, 249 (7th Cir.1986), but makes two arguments in support of his motion: (1) the facts of the case at bar are distinguishable from the facts of *Green*, and (2) the sixth circuit has held *contra* to *Green*. *See United States v. Gray*, 790 F.2d 1290, 1298 (6th Cir.1986), *rev'd on other grounds, McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987).

In *Green*, a police officer assigned to investigate hit-and-run traffic accidents solicited and/or accepted bribes from putative hit-and-run drivers, promising in return to ensure that the drivers' cases would not be referred to a prosecutor and their licenses would not be suspended. The mailings which allegedly furthered the defendant's bribe solicitation/acceptance scheme were notices to the putative drivers informing them that hit-and-run complaints had been made against their vehicles. Schneider argues that the case at bar is distinguishable from *Green* because in the case at bar, unlike the case in *Green*, the mailings, according to Schneider, were not sent until after the alleged object of the scheme was accomplished. Even assuming *arguendo* that this is true, that is not a basis for

---

**3.** Although Schneider's memorandum is not clear on this issue, this court construes his causation argument as one prong of a two-pronged "in furtherance" argument rather than as an argument which in and of itself warrants the dismissal of the mail fraud charges against him.

As discussed *infra* in this opinion, a defendant has "caused" a mailing if the mailing was reasonably foreseeable. Thus, the fact that a mailing is required by law to be mailed does not mean that a defendant cannot have "caused" them.

distinguishing *Green* insofar as that case held that mailings required by law to be sent can be the basis of a mail fraud charge even if they are not themselves false or fraudulent. Rather, this distinction goes to the "in furtherance" argument made by defendants Dempsey, Nowak, Anixter, and Ryan discussed above and is similarly without merit. *Green* is directly on point here. Accordingly, this court is not at all concerned with what the sixth circuit held in *Gray*.

In any case, even if *Green* were not the law of this circuit, and this court adopted the sixth circuit's rule of law, that law would not help defendants unless the mailings in this case were in fact not fraudulent. As discussed above, that is not at all undisputable. Thus, even if it were relevant whether these mailings were fraudulent, that issue would be for the jury to resolve at trial, not for this court to resolve on a motion to dismiss charges in an indictment.

■ Anixter argues that the mail fraud counts against him should be dismissed because they do not "adequately assert that [he] was even aware of the customer order mailings upon which the mail fraud charges are premised." Anixter's argument is that since he is not a broker, but rather a local "with no customers of his own, he had no reason to know of such [confirmation] documents or of the fact that they would be inserted into the United States mails." It is not necessary that a defendant be "aware" of specific mailings. All that is necessary is that a defendant "cause" a mailing. A defendant has "caused" a mailing for purposes of the mail fraud statute so long as the mailings were reasonably foreseeable. *United States v. Draiman*, 784 F.2d 248, 251 (7th Cir.1986) *citing Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954). This court agrees with the government's observation that any member of the CBOT could reasonably foresee that trade confirmations are sent to customers.

Anixter requests that if this court refuses to dismiss the mail fraud charges, it should alternatively order the government to file a bill of particulars "enumerating ... any facts that establish his specific intent to defraud, any activity on his part involving customers, and any facts suggesting that he knew of the scheme alleged in count 2." This request is *not* well-taken. This court has previously denied various defendants' motions for bills of particulars on the understanding that the government would file a *Santiago* proffer and expedite the turnover of various discovery materials to defendants long before it is required by law to do so. Anixter has not even suggested to this court that the government has not kept its end of the bargain.

### III. MOTIONS TO DISMISS CEA COUNTS

#### A. Cheat and Defraud Counts

■ Defendant Cox moves to dismiss those counts against him which allege "cheat and defraud" violations. The relevant statute provides in relevant part:

> It shall be unlawful ... for any member of a contract market ... in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any person ... to cheat or defraud such other person.

7 U.S.C. § 6b(1)(A). An example of a charge alleging a violation of this statute is, in relevant part, as follows:

> On or about May 23, 1988, at Chicago, Northern District of Illinois, Eastern Division, EDWARD A. COX III ..., being a member of the CBOT, a contract market, in connection with an order to make and the making of contracts of sale of soybeans, a commodity in interstate commerce, on behalf of another person and on and subject to the rules of the CBOT, did knowingly cheat and defraud said person, in connection with the execution of [certain specified orders].

Count 273. Cox argues that this and the other "cheat and defraud" charges are "fatally defective on their face ... [because] they fail to apprise [him] of the essential

facts and circumstances upon which [they] are predicated." This fatal defect, according to Cox, is that "[t]here is no further explication in any of these charges as to exactly what Mr. Cox is alleged to have done to cheat and defraud or to whom he did it." In so arguing, Cox ignores the plain language of the "cheat and defraud" charges, as well as allegations contained elsewhere in the indictment. The government correctly notes that each "cheat and defraud" count provides the defendant with the date of the charged offense, the identity of any other individuals who engaged in the cheating and defrauding with the defendant, and the customer order numbers involved. Additionally, count two contains detailed allegations of various types of fraudulent conduct, e.g., executing trades by prearrangement, accommodation, or offset. Reading the indictment as a whole, *United States v. Brack* at 1147, these allegations tell defendants enough to enable them to prepare their defense and establish a double jeopardy bar. The indictment need not allege the factual evidence by which the government intends to prove its cheat and defraud allegations.

Defendant Cox also moved to dismiss count 331 of the original indictment (now count 421) because the language of that count charged a "cheat and defraud" violation, 7 U.S.C. § 6b(1)(A), but cited the "fill by offset" statute, 7 U.S.C. § 6b(1)(D). This miscitation allegedly prejudiced Cox. To the extent that it did, that prejudice has been alleviated by the superseding indictment which corrects the miscitation.

**B. Accommodation Trade Counts**

■ Defendants Dempsey, Nowak, Ryan, and Anixter move to dismiss those counts of the indictment which allege "accommodation trade" violations. The relevant statute provides in relevant part:

> It shall be unlawful for any person to offer to enter into, enter into, or confirm the execution of, any transaction involving any commodity ... if such transaction is, is of the character of, or is commonly known to the trade as, a[n] ... accommodation trade...

7 U.S.C. § 6c(a)(3)(A). Defendants argue that this language is unconstitutionally vague per se. Since this case does not involve first amendment rights, defendants' facial attack on the statute is without merit.

Defendants next argue that the accommodation trade statute is unconstitutionally vague as applied to them. An example of such a count, in relevant part, is as follows:

> On or about January 6, 1988 ... JAMES D. NOWAK, ... knowingly offered to enter, entered and confirmed the execution of a contract of sale for the delivery of soybeans by entering a pre-arranged accommodation trade, as a money pass of $187.50 from ... Nowak to another trader...

Count 123. Defendants claim that they don't know that the statute proscribes that with which they are charged in part because the statute does not define the descriptive phrases "of the character of" or "commonly known in the trade as". Since neither of these two phrases is used in any of the accommodation trade counts, defendants' vagueness challenge of these phrases is without merit. Defendants argue that the language which is used in the indictment does not "tell[ ] [them] what they have done that is claimed to have violated the law other than the bare allegation that they conducted a 'pre-arranged' accommodation trade". As the government correctly notes, each alleged accommodation trade informs the defendant of the date of the alleged trade, the fact that it was pre-arranged, the person who participated with the defendant in the trade, the purpose of the trade (a "money pass"), and the amount of money actually passed. This is enough information to inform a person of ordinary intelligence of the charges against them. And these defendants are not just ordinary people of ordinary intelligence. They are members of an industry which utilizes its own unique jargon practically as a second language. When a statute uses industry jargon to define what is prohibited, a member of that industry cannot complain that that definition does not put him on notice that his contemplated conduct would violate that

statute. *See e.g., Precious Metals Associates, Inc. v. CFTC,* 620 F.2d 900, 907–908 (1st Cir.1980).

## C. Fill by Offset Counts

■■■ Defendants Anixter and Cox raise per se and "as applied" vagueness objections to those counts of the indictment which allege "fill by offset" violations. The relevant statute provides in relevant part:

> It shall be unlawful ... for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ... to fill such order by offset against the order or orders of any other person, or willfully and knowingly and without the prior consent of such person to become the buyer in respect to any selling order of such person.

7 U.S.C. § 6b(1)(D). Again, because first amendment rights are not involved in this case, defendants' per se vagueness objection to this statute is without merit.

Defendants also argue that the statute is unconstitutionally vague as applied to them. An example of a charge alleging a violation of this statute is as follows:

> On or about November 19, 1987, ... JOHN H. RYAN and SCOTT C. ANIXTER ... being members of the CBOT, a contract market, willfully aided, abetted, counselled, commanded, induced and procured the commission of an offense by another member of the CBOT, who, in connection with an order to make and the making of a contract of sale of soybeans ... on behalf of another person and on and subject to the rules of the CBOT, did knowingly fill a customer order for such person by offset against the order of another in connection with the execution of [certain specified customer orders]

Count 78. Defendant Anixter argues that this charge does not "tell [him] what he has done that is claimed to have violated the law other than the bare allegation that he

aided and abetted the filling of a customer order by offset." (Anixter does not argue that the terms "aid" and "abet" are vague). Each offset charge alleges the date of the offense, the other defendant who engaged in that conduct with him, and the customer orders involved. That is enough to inform Anixter of the charges against him.

Defendant Cox argues that "[t]hese orders were not 'matched' or 'crossed' as those terms are defined by the relevant case law and thus are not offset as that term is used in the statute." Thus, defendant Cox apparently understands that, as used in the statute, the term "offset" means "matched" or "crossed". He thus cannot complain that he does not know of what the offset charges accuse him. To the extent that his argument is that the offset charges fail to state an offense because he in fact did not do that which the indictment alleges that he did, he will have to make that argument to the jury.

## D. False Records Counts

■■■ Defendant Cox also argues that those counts of the indictment which charge him with "false records" violations should be dismissed because they fail to allege the essential elements of the offense. The relevant statute provides, in relevant part, as follows:

> It shall be unlawful ... for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person ... willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof.

7 U.S.C. § 6b(1)(B). An example of a charge alleging a violation of this statute is as follows:

> On or about May 3, 1988 ... EDWARD A. COX III ... being a member

of the CBOT, a contract market, and Michael Weiser in connection with an order to make and the making of a contract of sale of soybeans ... on behalf of another person and on and subject to the rules of the CBOT, willfully entered and caused the entry of a false record of a contract of sale of soybeans for such person in connection with the execution of [certain specified customer orders].

Count 217. Cox's objection to this language is that it does not "specify in any fashion the conduct of this defendant which is said to be criminal." Cox wants to know which record is alleged to be false and in what manner it is false. Cox need look no further than paragraph thirty of count two to obtain this information. That paragraph states:

It was further a part of the scheme that the defendants would falsely make and cause the making of false reports of their trading activities, which reports falsely reflected the number, amounts, times and true nature of the falsely reported trades, and which false reporting included the submission of trading cards and executed customer orders which falsely reflected trading activity and the time bracket in which the trading activity purportedly occurred, well knowing that said false reporting would be officially reflected in [Futures Commission Merchants] trade records and registers and customer accounts in confirmation statements.

This language clearly informs Cox which records the government claims are false and the manner in which they are false.

## IV. CONCLUSION

None of the statutes which defendants are charged with violating are unconstitutionally vague either per se or as applied to defendants. Each count challenged by these motions properly states an offense. The indictment, taken as a whole, sufficiently informs the defendants of the charges against them. Defendant Barcal has neither a presumption nor any evidence of prosecutorial vindictiveness in connection with the government's decision to charge him in the superseding indictments with RICO conspiracy after he demanded a jury trial. The mail and wire fraud counts do not violate the *ex post facto* clause of the federal constitution. Accordingly, defendants' motions to dismiss various counts of the indictment, or in the alternative to strike certain portions of certain counts, are denied.